No. 98-372

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 59

STATE OF MONTANA,

Plaintiff and Appellant,

v.

LEONARD LEROY ROBERTS,

Defendant and Respondent.

APPEAL FROM: District Court of the Twenty-First Judicial District,

In and for the County of Ravalli,

The Honorable Jeffrey H. Langton, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Hon. Joseph P. Mazurek, Attorney General, Helena, Montana

Jennifer Anders, Assistant Attorney General, Helena, Montana

George H. Corn, Ravalli County Attorney, Hamilton, Montana

Geoffrey Mahar, Deputy County Attorney, Hamilton, Montana

For Respondent:

Randall E. Lint; Birdsong & Lint, Hamilton, Montana

Submitted on Briefs: November 12, 1998

Decided: March 25, 1999

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

**¶1. Leonard Leroy Roberts (Roberts) was charged by information on July 22, 1997, with the offenses of (1) Driving or Being in Actual Physical Control of a Vehicle While Under the Influence of Alcohol (Sixth Offense), a felony, and (2) Driving Without a Valid Driver's License, a misdemeanor. Roberts filed a motion to suppress all evidence obtained incident and subsequent to the investigatory stop that gave rise to his arrest. The State of Montana (the State) appeals from the order of the Twenty-First Judicial District Court, Ravalli County, granting Roberts' motion to suppress. We reverse and remand.**

**¶2. We restate the issue on appeal: Did the District Court err in suppressing the State's evidence on the ground that the arresting officer lacked a particularized suspicion of wrongdoing to stop Roberts' motor vehicle?**

Factual and Procedural Background

**¶3. Hearing loud and angry voices outside her house at 105 Daly Ave. in Hamilton on the evening of July 4, 1997, Davie Joan Neville (Neville) peeked out her window to investigate. In the front yard of the house next door at 107 Daly Ave., Neville observed that two men, whose movements were unsteady and whose speech was slurred, were engaged in a heated exchange. This conflict culminated with one man**

attempting to hit the other man with a piece of rebar. The sloppy speech and mannerisms of the two men led Neville to believe that they were extremely intoxicated. Neville then observed the two men climb into a white pickup truck and leave the house next door, heading towards downtown Hamilton. Just before 9:00 p. m. on the evening of July 4, 1997, Neville called the 911 dispatcher in Hamilton "to report a guy that is drunk, [who] just left the driveway" of 107 Daly Ave. in a pickup truck.

¶4. The information given by Neville to the 911 dispatcher included: Neville's description of the truck as a white Ford pickup, license plate number 13T-76V; Neville's observation that the truck, which contained two male occupants who had been engaged in a "big fight" at 107 Daly Ave., appeared to be traveling towards downtown Hamilton; Neville's belief that the man driving the pickup, whom she could not identify by name or description, was "drunk" and "shouldn't be driving" because he "can barely walk"; and Neville's name, address, and phone number.

¶5. Shortly after Neville's call, at 8:57 p.m., the 911 dispatcher sent out an "attempt to locate" bulletin to all police on patrol that evening. Overhearing this dispatch, on-duty Hamilton police officer, Ryan Oster (Officer Oster), responded. Officer Oster positively identified the white Ford truck approximately three minutes later, around 9:00 p.m., parked in downtown Hamilton. Although the pickup was unoccupied, Officer Oster noted that the truck was parked across the street from the Rainbow Bar. At that time, Officer Oster did not investigate the complaint further, but continued on his routine patrol.

¶6. Approximately 38 minutes later, at about 9:38 p.m., Officer Oster again passed by the Rainbow Bar and observed that the white pickup truck was no longer parked across the street. As he continued on his routine patrol, however, Officer Oster spotted the truck about a block-and-a-half away traveling back towards Daly Ave.[1] Because Officer Oster could not identify who was driving the pickup from that distance, he decided to "catch up with the vehicle" and watch for signs of drunk driving. Officer Oster, a veteran of over 100 investigatory traffic stops, did not turn on his lights or sirens as he followed the pickup truck. During this time, Officer Oster did not observe any erratic driving or infractions of traffic laws.

¶7. Officer Oster followed the white pickup truck and watched it turn into the one-lane driveway at 107 Daly Ave. Officer Oster pulled into the driveway behind the

pickup truck, blocking its exit.[2] Upon blocking Roberts' exit, both Officer Oster and Roberts got out of their vehicles simultaneously. Without any verbal invitation, Officer Oster then walked up the driveway and began to speak with Roberts. Officer Oster immediately noted that Roberts was "extremely unsteady on his feet" and "had to hang on to the side of the vehicle" to steady himself. In response to questioning, Roberts informed Officer Oster that he had injured his knee earlier in the day.[3] However, Officer Oster observed a "very strong odor" of alcohol on Roberts' breath, and also noted that his speech was "slow and slurred."

¶8. Due to Roberts' difficulty standing and the smell of alcohol on his breath, Officer Oster administered several field sobriety tests on Roberts and subsequently arrested him for driving under the influence of alcohol and driving without a valid Montana driver's license. Later, at the Ravalli County Sheriff's Office, Roberts provided a breath sample and his blood alcohol concentration was found to be .221.

¶9. Although police attempted, after Roberts' arrest, to obtain an official statement from Neville, she steadfastly refused to cooperate. Only when the State subpoenaed Neville, did she appear at the suppression hearing and testify.[4] Following the suppression hearing, the District Court held that "Officer Oster did not have sufficient objective facts to support the conclusion that [Roberts] was engaged in wrongdoing and therefore when he blocked [Roberts'] car in the driveway, he effected an unconstitutional seizure of [Roberts] under the Fourth Amendment." The State appeals from this determination.

Discussion

¶10. Did the District Court err in suppressing the State's evidence on the ground that the arresting officer lacked a particularized suspicion of wrongdoing to stop Roberts' motor vehicle?

¶11. The standard of review for a district court's grant of a motion to suppress is whether the court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. State v. Henderson, 1998 MT 233, ¶ 9, 966 P.2d 137, ¶ 9, 55 St.Rep. 980, ¶ 9. A trial court's findings are clearly erroneous if not supported by substantial evidence, if the court has misapprehended the effect of the evidence, or if this Court's review of the record leaves us with the firm conviction that a mistake has been made. *Henderson*, ¶ 9 (citing Interstate Production Credit v.

DeSaye (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287).

¶12. When a police officer seizes a person, such as in a brief investigatory stop of a vehicle, the Fourth Amendment right against unreasonable searches and seizures applies. Bauer v. State (1996), 275 Mont. 119, 125, 910 P.2d 886, 889; *see also* Reid v. Georgia (1980), 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890, 893. However, this Court has recognized an exception to the general warrant requirement of the Fourth Amendment, which permits a limited and reasonable investigatory stop of a vehicle without probable cause where the State can establish: (1) objective data from which an experienced law enforcement officer can make certain inferences; and (2) a resulting particularized suspicion that the occupant of the vehicle is or has been engaged in wrongdoing or was a witness to criminal activity. State v. Gopher (1981), 193 Mont. 189, 194, 631 P.2d 293, 296 (borrowing the test from United States v. Cortez (1981), 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621); *see also* Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.

¶13. This legal standard of "particularized suspicion" of wrongdoing is now codified at § 46-5-401, MCA, which provides:

**Investigative Stop.** In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense.

Section 46-5-401, MCA. The question of whether particularized suspicion of wrongdoing exists is a factually driven inquiry dependent upon the totality of circumstances giving rise to the investigative stop. State v. Reynolds (1995), 272 Mont. 46, 50, 899 P.2d 540, 542-43.

¶14. At the outset, we must determine whether an investigative stop occurred in this case. Even though, as the State points out, Roberts voluntarily pulled into the driveway and could have simply ignored Officer Oster's presence and walked into the house at 107 Daly Ave., we have no problem concluding, as the District Court did, that Officer Oster's actions constitute an investigative stop within the meaning of the Fourth Amendment. This case is factually similar to United States v. Kerr (9th Cir. 1987), 817 F.2d 1384, wherein the Ninth Circuit Court of Appeals faced "the unusual problem of characterizing an automobile stop as either a voluntary encounter or an investigative stop." *Kerr*, 817 F.2d at 1386.[5] In *Kerr*, an officer was

on routine patrol in a rural neighborhood when he observed a parked car, with its trunk open, near a barn located on a residential property. In order to reach this residence, it was necessary to drive approximately seventy to one-hundred feet down a one-lane dirt driveway. Instead of waiting in his patrol car at the roadside, the officer pulled into and blocked the one-lane driveway just as the defendant was backing his car out. When the officer's vehicle was within approximately forty to fifty feet of the defendant's car, the defendant exited his vehicle and approached the officer on foot. The officer subsequently questioned the defendant, investigated the premises and, upon discovering a methamphetamine laboratory in the barn, arrested the defendant. *Kerr*, 817 F.2d at 1385.

¶15. The district court in *Kerr* concluded that the encounter did not constitute a seizure within the meaning of the Fourth Amendment, as " 'the mere fact that the road was temporarily blocked by a police car is not detention, inasmuch as defendant Kerr still could have done numerous things at this point, such as driving around the car, or simply ignoring the police officer.' " *Kerr*, 817 F.2d at 1386. The Ninth Circuit disagreed, finding that the officer had "precipitated the confrontation" when he pulled into the one-lane driveway and blocked the defendant's exit. Under these circumstances, the court concluded:

[The officer's] authority and conduct provided [the defendant] with no reasonable alternative except an encounter with the police. Consequently, the encounter cannot be deemed voluntary. Voluntariness presupposes a freedom of choice that [the defendant] did not have. The district court's suggestion that [the defendant] could have backed around the car or ignored [the officer] defies common sense; [the defendant's] freedom to depart was restrained at the moment [the officer] blocked the one-lane driveway. [Emphasis added.]

*Kerr*, 817 F.2d at 1387.

¶16. "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave." United States v. Mendenhall (1980), 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (footnote omitted). In this case, as in *Kerr*, while Officer Oster could have merely parked his patrol car on the shoulder in front of 107 Daly Ave., he chose to instead pull into the one-lane driveway and block Roberts' exit, thereby physically constraining Roberts' means and direction of travel. Furthermore, Officer Oster was

armed and in uniform, and his show of authority in immediately exiting his patrol car and approaching Roberts added to the official nature of the encounter. Given these circumstances, the District Court correctly concluded that "[a] reasonable person would not have felt free to leave a situation where a uniformed officer, in his patrol car, pulled his car into a driveway behind that person's car, blocking its exit." We hold that when Officer Oster pulled his patrol car into the one-lane driveway at 107 Daly Ave., thereby blocking Roberts' exit, he precipitated an investigative stop-- amounting to a Fourth Amendment "seizure" of the person--during which a reasonable person would not have felt free to simply leave.

¶17. We must now decide whether Officer Oster possessed a sufficient particularized suspicion of wrongdoing to justify the stop of Roberts' vehicle. Where, as here, an investigative stop stems from the tip of a citizen informant, this Court has adopted a three-part test to determine the reliability of the citizen informant's information: (1) whether the citizen informant identified herself to the authorities and thus exposed herself to civil and criminal liability if the report is false; (2) whether the report is based upon the citizen informant's personal observations; and (3) whether the officer's own observations corroborated the informant's information. State v. Pratt (1997), 286 Mont. 156, 165, 951 P.2d 37, 42-43.

¶18. The State contends that Officer Oster had a particularized suspicion of wrongdoing to justifiably stop Roberts' vehicle based upon the information provided by Neville and Officer Oster's subsequent corroboration of that information, as required by *Pratt*. Roberts relies upon our decision in State v. Lee (1997), 282 Mont. 391, 938 P.2d 637, to argue that the District Court did not err in finding that an unconstitutional seizure had occurred.

¶19. We agree with the District Court that the threshold element of *Pratt* is satisfied. Neville provided her name, address, and phone number to the 911 operator, thereby subjecting herself not only to civil liability, but also to criminal prosecution pursuant to § 45-7-205, MCA, if the authorities determined that the report was fabricated. We are unconvinced by Roberts' attempt to analogize this case to that of *Lee*, in which the citizen informant did not subject herself to civil or criminal liability because the tip was from an "anonymous caller." *See Lee*, 282 Mont. at 395, 938 P.2d at 640; *see also Pratt*, 286 Mont. at 167, 951 P.2d at 44. Since Neville provided ample information upon which to find her liable for a false report, we give little stock to Roberts' argument that her "refusal to cooperate" with authorities following the

initial 911 call suggests that Neville's tip "should be likened to that of an anonymous informant."

¶20. However, we disagree with the District Court's conclusion that neither the second nor the third *Pratt* elements are met in this case. With respect to the second *Pratt* element--whether the citizen informant's report is based on personal observations--the District Court reasoned that the "limited information" provided in Neville's 911 call undermined its reliability:

[Neville] identified the truck, and said she suspected the individual driving the truck was intoxicated, because "he can barely walk." She did not identify the driver or passenger by name or description. She was able to only surmise where the truck was headed, and was not as particular as the informant in *Pratt*, who stated what direction and on what street the vehicle was traveling.

¶21. Roberts argues that the court correctly found that, similar to *Lee*, Neville did not provide sufficient information to determine whether Neville's call was based on her personal observations. We disagree. In *Lee*, the anonymous caller provided only the following information: a statement that she " 'believed [the defendant] was under the influence of alcohol and speeding,' " along with a description of the vehicle and the direction in which it was heading. *Lee*, 282 Mont. at 395, 938 P.2d at 640. While it is true that, like the informant in *Lee*, Neville did not state whether she had actually observed Roberts drinking or driving erratically, we adjudge Neville's information to be at least on par with that provided by the informant in *Pratt* and, thus, reliable.

¶22. In *Pratt*, a night manager for a convenience store informed authorities that he had observed a driver whom he believed to be intoxicated, and provided a description of the vehicle, including its license plate number, and the street name and direction in which the vehicle was traveling. *Pratt*, 286 Mont. at 159, 951 P.2d at 39. Here, Neville informed the 911 dispatcher that, from her residence at 105 Daly Ave., she had observed two males engaged in a "big fight" in the front yard of 107 Daly Ave.; that the men had then climbed into a white Ford pickup truck, license plate number 13T-76V, and left the residence, heading down Daly Ave. in the general direction of downtown Hamilton; and that the driver was "drunk" because he could "barely walk."

¶23. Furthermore, as we recognized in *Pratt*:

An officer may infer that the information is based on the informant's personal observations if the information contains sufficient detail that

"it is apparent that the informant had not been fabricating [the] report out of whole cloth . . . [and] the report [is] of the sort which in common experience may be recognized as having been obtained in a reasonable way . . . ."

*Pratt*, 286 Mont. at 165, 951 P.2d at 42-43, quoting *State v. Villegas-Varela (Or. App. 1994)*,

887 P.2d 809, 811. Thus, even though it was unclear from the record whether the informant in *Pratt* had personally observed the defendant, we concluded that the informant's identification of himself as an "on-duty manager of a retail establishment" provided sufficient information to infer that he was "in a position to have observed" the defendant's intoxication. *Pratt*, 286 Mont. at 166, 951 P.2d at 43.

**¶24. Likewise, we conclude that the transcript of Neville's 911 call is of sufficient detail to infer that her report is of the sort which in common experience may be recognized as having been obtained in a reliable way. The information relayed by Neville, as Roberts' next door neighbor, clearly placed her in a position to have observed indications of Roberts' intoxication. The basis for Neville's report that Roberts was a drunk driver consisted primarily of the following personal observations: "There was a big fight and then he got in the pickup with another guy, but he shouldn't be driving. He can barely walk." While Roberts' difficulty walking may be explained in part after the fact by his knee injury, it was reasonable for the authorities to infer that the altercation Neville observed was alcohol-related. Nor should we disregard, under the totality of the circumstances, the fact that Neville's report was filed on the eve of the Fourth of July, a national holiday renowned among Americans for its celebratory fervor. We hold that the second *Pratt* element is satisfied in this case.**

**¶25. Moreover, pursuant to the third element of the *Pratt* test, we conclude that Officer Oster adequately corroborated the information provided by Neville, thus giving rise to a particularized suspicion that Roberts was driving under the influence of alcohol. In so concluding, we disagree with the District Court's finding that Officer Oster's corroboration was not sufficiently "timely" because of the 38-minute time-lapse between his initial identification of the pickup and his ensuing pursuit of that truck. Principles of common sense must guide an officer's assessment of the objective**

facts and the reasonable inferences to be drawn therefrom in deciding whether to initiate an investigative traffic stop, much as common sense must illumine this Court's review of whether an officer had the requisite particularized suspicion to justify such a stop. "Drawing artificial distinctions or 'time lines' in situations such as these does not comport with reality or common sense." State v. Sharp (1985), 217 Mont. 40, 47, 702 P.2d 959, 963.

¶26. Corroboration occurs, under the third *Pratt* factor, when the officer either observes illegal activity <u>or</u> finds the person, the vehicle, or the vehicle's occupants "<u>substantially as described by the informant.</u>" *Pratt*, 286 Mont. at 165, 951 P.2d at 43 (emphasis added). In applying the *Pratt* test, it is important to remember that the standard of "particularized suspicion does not require that the law enforcement officer be certain that an offense has been committed." *Henderson*, ¶ 12 (citing State v. Morsette (1982), 201 Mont. 233, 240, 654 P.2d 503, 507). Furthermore, a trained and experienced law enforcement officer is entitled to draw inferences and make deductions that might well elude a layperson in determining whether a specific vehicular stop is justified. *Gopher*, 193 Mont. at 192-93, 631 P.2d at 295 (citing *Cortez*, 499 U.S. at 418, 101 S.Ct. at 695, 66 L.Ed.2d at 629).

¶27. Officer Oster, a veteran of over one-hundred prior investigatory traffic stops, corroborated Neville's description of the white pickup, as well as her tip that it had been heading in the general direction of town, when he positively identified the truck in downtown Hamilton a mere three minutes after receiving Neville's information from the 911 dispatcher. Although the vehicle was unoccupied at that time, Officer Oster noted that the truck was parked across the street from the Rainbow Bar at a time of night when most of the other businesses in the vicinity had already closed. Roughly 38 minutes later, Officer Oster again spotted the same vehicle, and noted at that time that the vehicle contained two occupants, as Neville had reported. While Officer Oster did not observe any indications of drunk driving in pursuing the vehicle, he did follow the pickup back to 107 Daly Ave., the very same address which Neville's 911 call had identified as the locale of the "big fight" earlier in the evening. Given these circumstances, it was reasonable for Officer Oster to infer that the driver of the pickup--later identified as Roberts--left 107 Daly Ave. with a passenger and drove approximately five blocks to the Rainbow Bar to have a drink or purchase some alcohol, and that the driver he observed in the vehicle returning to 107 Daly Ave. was in fact the very same drunk driver whom Neville had reported driving away from that residence shortly before.

¶28. Thus, in concluding that Neville's tip was not reliable and that Officer Oster's corroboration was not sufficiently timely, the District Court misapprehended the effect of the evidence before it. As such, the findings of the court regarding Officer Oster's lack of a particularized suspicion of wrongdoing are clearly erroneous. We hold that the investigatory stop of Roberts' vehicle was justified pursuant to § 46-5-401, MCA. Accordingly, we reverse the order of the District Court granting Roberts' motion to suppress and remand for trial. At trial, the State shall be permitted to introduce all evidence obtained incident and subsequent to the investigative stop giving rise to Roberts' arrest.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ J. A. TURNAGE

/S/ JAMES C. NELSON

Justice Karla M. Gray, specially concurring.

¶29. I concur in the result reached by the Court and, indeed, in its *Pratt* analysis. I would not reach the *Pratt* issue, however, because I would reverse the District Court's determination that an investigative stop occurred in this case.

¶30. As the Court points out, Roberts had just pulled into the driveway at 107 Daly Avenue when Officer Oster pulled in behind him. He easily could have ignored Officer Oster and proceeded into the house at that address. That he did not do so does not convert a voluntary encounter into an investigative stop.

¶31. Moreover, *Kerr* is readily distinguishable. There, the officer blocked the one-lane driveway just as the defendant was backing his car out. As the Court emphasizes from the Ninth Circuit's opinion, the defendant's "freedom to depart" was restrained when the officer blocked the driveway. In the present case, however, Roberts was not attempting to depart and being--as the Court puts it--physically constrained as to his means and direction of travel by Officer Oster's arrival. Indeed, he had arrived at the place he was intending to reach and could have proceeded inside. I would conclude that the encounter between Roberts and Officer Oster was

voluntary and that no investigative stop occurred. On that basis, I would reverse the District Court's suppression of the evidence.

/S/ KARLA M. GRAY

Justice Jim Regnier dissenting.

¶32. I respectfully dissent from the majority's opinion reversing the District Court's suppression of the State's evidence.

¶33. The District Court carefully analyzed the facts of this case under our recent pronouncements in *State v. Lee* (1997), 282 Mont. 391, 938 P.2d 637, and *State v. Pratt* (1997), 286 Mont. 156, 951 P.2d 37. I agree with the majority that the first two parts of the *Pratt* test have been satisfied, that is, first, the citizen informant identified herself to the authorities, and, second, the informant's report was based upon an informant's personal observations. I do not believe, however, that the third part of the *Pratt* test, namely corroboration by the officer, was met.

¶34. The District Court found that the citizen informant did not identify the driver or passenger by name or description. Officer Oster did observe the truck in question parked in Hamilton shortly after the informant's call, but it was 38 minutes later that Oster observed the truck being driven back toward 107 Daly. Without a description of the driver, Oster had no idea if the individual driving the truck was the same individual that the informant observed leave 107 Daly over one-half hour before. By the time Oster observed the truck, the informant's information was nearly 40 minutes old, and when Oster parked his patrol car behind the defendant's truck, he had only scant information from the 911 call, observed no traffic violations, and had no other basis to justify the stop.

¶35. In *Pratt*, corroboration was found where the officer "observed the described vehicle within a short period of time, traveling in the direction and on the same street indicated by Lafournaise." *Pratt*, 286 Mont. at 166, 951 P.2d at 43. The investigative stop in *Pratt* occurred "mere moments" after the officer was advised by dispatch. *See Pratt*, 286 Mont. at 167, 951 P.2d at 44. Under this scenario, the officer could be almost certain that the person driving was the same one reported mere moments before. Here, the informant was only able to surmise where the truck was headed. By the time Oster saw the vehicle in motion, he had no idea who was driving. The officer

conducting the stop must have a particularized suspicion and objective basis for suspecting the particular person stopped of criminal activity. *See Lee*, 282 Mont. at 394, 938 P.2d at 639. Furthermore, where a citizen tip is less reliable, as with the tip here, more corroboration is required by the arresting officer to establish particularized suspicion. *See Pratt*, 286 Mont. at 168, 951 P.2d at 44.

¶36. I would affirm the District Court's suppression of this evidence. In my view, the District Court properly concluded that, based on the totality of the circumstances, there was not a particularized suspicion to support this investigative stop.

/S/ JIM REGNIER

Justices William E. Hunt, Sr., and Terry N. Trieweiler join in the foregoing dissent.

/S/ WILLIAM E. HUNT, SR.

/S/ TERRY N. TRIEWEILER

[1] The distance between 107 Daly Ave. and the Rainbow Bar is approximately 4½ to 5½ city blocks.

[2] Exhibits admitted at the suppression hearing show that the house at 107 Daly Ave. sits on the back of a small ¼-acre lot; that the one-lane driveway is only wide enough to accommodate one vehicle for purposes of entry to and exit from the residence; that an irrigation ditch runs along the front edge of the lot, through the yard and underneath the driveway; and that, at the front of the lot parallel to the irrigation ditch, there is an unpaved shoulder with sufficient space to park a vehicle.

[3] In fact, Roberts had injured his knee earlier that day. Following his arrest, Roberts was thus taken to the local emergency room and given crutches prior to being booked in jail.

[4] As Roberts correctly notes, Neville's testimony at the suppression hearing is largely irrelevant to the Fourth Amendment issue in this case because most of the information conveyed by Neville at the hearing was not communicated to the 911 dispatcher on the night in question and, thus, cannot be considered in determining whether Officer Oster had a particularized suspicion of wrongdoing to stop Roberts' vehicle on the evening of July 4, 1997.

[5] This is a crucial characterization because a purely voluntary encounter between a law enforcement officer and a citizen intrudes upon no constitutionally protected interest and, thus, is accorded no protection under the Fourth Amendment. *See Kerr*, 817 F.2d at 1386.