DA 06-0554

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 161

STATE OF MONTANA,

      Plaintiff and Respondent,

  v.

RAYMOND CASE, JR.,

      Defendant and Appellant.


APPEAL FROM:    District Court of the Thirteenth Judicial District,
                      In and For the County of Yellowstone, Cause No. DC 05-055
                      Honorable Russell C. Fagg, Presiding Judge


COUNSEL OF RECORD:

      For Appellant:

           Jim Wheelis, Chief Appellate Defender; Roberta R. Zenker,
           Assistant Appellate Defender, Helena, Montana

      For Respondent:

           Honorable Mike McGrath, Attorney General; Ilka Becker,
           Assistant Attorney General, Helena, Montana

           Dennis Paxinos, County Attorney, Billings, Montana


                         Submitted on Briefs:  May 23, 2007

                                  Decided:  July10, 2007


Filed:

                _____
                            Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1     Defendant Raymond Case was convicted of two counts of felony possession of dangerous drugs and one count of possession of dangerous drug paraphernalia, a misdemeanor. The drugs were found during an alleged consent search of Case's vehicle conducted after Case was pulled over for a traffic violation. Case moved to suppress the evidence, asserting that the officer exceeded the scope of the initial stop by detaining him and continuing to question him after issuing the traffic citations. We affirm.

¶2     We restate the issue as follows:

¶3     Did the District Court err in denying Case's motion to suppress evidence?

## BACKGROUND

¶4     On the evening of January 19, 2005, Officer Reid observed an older Cadillac, driven by Case, approach with its headlights off. Case, according to Reid, looked directly at the patrol car, then reversed and made a u-turn. As Case drove off, Reid followed. Case then ran a red light and Reid activated his lights, signaling Case to pull over. At this point, Reid turned on his patrol car's video camera. Case continued past a Pizza Hut parking lot and pulled into the Warbonnet Inn where he had a room and was planning to stay. He parked toward the back of the parking lot. Reid pulled in behind him, effectively blocking Case's departure.

¶5     As Reid pulled in, Case began to get out of his car. Reid told him to remain in his car. Case complied. According to Reid's testimony, Case, once back in the car, leaned forward as if to shove something underneath the seat. Reid then walked up to Case's car and explained that he pulled him over for running a red light. Reid asked for Case's

2

license, registration, and proof of insurance, and also wrote down his address and phone number.

¶6    Two other passengers, Marsha White Wolf and Patrick Eatherton, were seated on the front seat next to Case. Though Case did not appear to be intoxicated, Reid was sure that the two passengers were. Officer Tucker, who had arrived on the scene just after Reid pulled Case over, questioned the passengers. White Wolf was known to the Billings police. Eatherton, who presented his federal prisoner ID card, had formerly fired a gun at police. For this reason, dispatch asked Reid if he had "cover."

¶7    During the initial communication with Case, Reid asked him where he was headed. Case answered "here," indicating the motel. Reid then asked where he was coming from. Case paused for a couple of seconds, and White Wolf answered, with somewhat slurred speech, "April's." She then clarified that they had come from "April Romero's." Reid later testified that April Romero's house was a "house of interest" that he was actively investigating as a possible meth lab.

¶8    Reid and Tucker then returned to Reid's patrol car. Reid called in all three passengers to dispatch. All came up negative for arrest warrants. Another officer, Officer Korell, informed Reid over the radio that he had pulled over Case the previous evening in the same vehicle. Apparently a Michelle Malard was driving. Syringes were found and Malard was arrested though Case was not. Upon hearing this, Tucker relayed that he had worked on a prior case involving this Michelle Malard and a *Ronald* Case. Ronald had skipped town and was as yet on the loose. Tucker therefore questioned whether Raymond and Ronald were the same person, or related to one another.

3

¶9      To find out, Reid suggested that Tucker ask Case for his social security number. Tucker walked back to Case's window and asked him for his social security number and asked if he knew anything about Ronald Case.  Reid then obtained Case's social security number from dispatch, and it matched the number Case had provided to Tucker.  Tucker, however, was still suspicious.  Though he had not seen Ronald, he did know that Ronald had a black widow tattoo on his right arm.  Consequently, Reid suggested that they "pull [Case] out" to "see what [was] going on."  Reid also noted that it "took them forever to pull over," and suggested "something ain't right."

¶10     Reid, the lights of his patrol car still flashing, then walked back to Case's window. He asked Case to step out of his car.  Case complied and, before mentioning the traffic ticket, Reid asked Case if he had any weapons on him.  Case replied that he had a Gerber knife and pulled it out of his pocket.  Reid set the knife on the back of Case's car. Tucker, by this time, had walked up to the back of Case's car, near Case and Reid.  Reid issued Case a traffic ticket and explained how to pay the ticket.  Reid then returned Case's license and some paperwork.

¶11     As Reid was handing the last piece of paperwork back to Case he said "I'm going to give you this back and I do have a question for you before you take off here."  Reid actually asked Case four questions.  The first was "what's your business in town?  What are you doing here?"  Case answered that he was trying to bail out the woman arrested the night before (Malard).  Reid then responded, "that was one of the other questions I had," and continued to ask about the prior stop and the syringes found in the car.

4

¶12    Reid's third question concerned the Ronald/Raymond dilemma. Case responded that Tucker had asked him about Ronald before and that he did not know a Ronald Case. Tucker then stepped up and asked "would you mind if I take a look at your right arm?" Case replied "yea, sure," and took off his coat. Tucker shined his flashlight on Case's arm, then, holding his arm, pushed up his shirt to check his upper arm. After showing his arm, Case began to put his jacket back on. Reid told him "go ahead and put your coat back on," and then, without pausing, asked his final question: "Is there anything in your vehicle tonight?"

¶13    Case replied "no sir" and stated "it's all yours" twice while motioning to his car. Reid thanked Case and proceeded to search the car, after briefly patting Case down and removing the two passengers. Reid found syringes in the car as well as a white substance later identified as rock cocaine. After arresting and booking Case, Tucker found, in the back seat of the patrol car where Case had been seated, a small plastic baggie containing methamphetamine.

¶14    Case moved to suppress the evidence obtained during the search of his car, arguing that the officers impermissibly exceeded the scope of the traffic stop. The State opposed the motion, arguing that the officer had particularized suspicion to stop Case because he had committed a traffic violation. The State further contended that Case was not detained when he gave permission to search the car. Case replied that he was being detained when he gave permission to search.

¶15    Following an evidentiary hearing where Officers Reid and Tucker testified, the District Court denied Case's motion to suppress. The court concluded that there was

particularized suspicion to stop Case and that Case was no longer detained when he granted permission to search. Following trial, Case was found guilty of all three counts. Case then filed this timely appeal.

**STANDARD OF REVIEW**

¶16    We review a district court's ruling on a motion to suppress evidence to determine whether the court's findings of fact are clearly erroneous and whether its interpretation and application of the law are correct. *State v. Snell*, 2004 MT 269, ¶ 7, 323 Mont. 157, ¶ 7, 99 P.3d 191, ¶ 7 (citations omitted).

**DISCUSSION**

¶17    **Did the District Court err in denying Case's motion to suppress evidence?**

¶18    Case argues that the consent he gave to search his car was involuntary because he was illegally detained when he consented, and therefore the evidence discovered as a result of the search of his car should be suppressed. The District Court, however, rejected this contention and concluded that Case was not detained at the time.

¶19    The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution protect individuals from unreasonable searches and seizures. *Snell,* ¶ 9. A search or seizure conducted in the absence of a valid warrant is *per se* unreasonable unless justified by a recognized exception to the warrant requirement. *Snell,* ¶ 9. Knowing and voluntary consent to a search is a recognized exception to the warrant requirement. *Snell,* ¶ 9.

¶20    We apply the totality of the circumstances test in determining whether consent has been voluntarily given and is uncontaminated by coercion or duress. *State v. Copelton,*

6

2006 MT 182, ¶ 19, 333 Mont. 91, ¶ 19, 140 P.3d 1074, ¶ 19 (citations omitted). Thus, the determination of voluntariness of consent is dependent on the facts of each case, with no single fact being dispositive. *Copelton,* ¶ 19 (citations omitted).

¶21 Additionally, when an officer seizes a person, such as in a brief investigatory stop of a vehicle, the Fourth Amendment right against unreasonable searches and seizures applies. *State v. Roberts*, 1999 MT 59, ¶ 12, 293 Mont. 476, ¶ 12, 977 P.2d 974, ¶ 12 (citations omitted). However, this Court recognizes an exception to the general warrant requirement, permitting a limited and reasonable investigation without probable cause, where the State can show circumstances that create a particularized suspicion that the person is or has been engaged in wrongdoing or was a witness to criminal activity. *Roberts*, ¶¶ 12-13 (citing state and federal cases as well as § 46-5-401, MCA).

¶22 We must consider, then, whether Case was seized when he gave consent to search; if so, whether the officer possessed sufficient particularized suspicion to further detain Case and continue the investigation; and, finally, whether Case's consent was valid in light of the totality of the circumstances.

¶23 A. Was Case detained when he gave the arresting officer consent to search his vehicle?

¶24 "A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave." *Roberts*, ¶ 16 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877 (1980)). This test is applicable to seizure issues raised under both the Fourth Amendment to the United States Constitution

7

and Article II, Section 11, of the Montana Constitution. *Snell*, ¶ 22 (citing *State. v. Merrill*, 2004 MT 169, ¶¶ 10-11, 322 Mont. 47, ¶¶ 10-11, 93 P.3d 1227, ¶¶ 10-11). In addition, this test is "purely objective." *Snell*, ¶ 22 (quoting *Merrill*, ¶ 11).

¶25 A reasonable person would not feel free to leave if he is physically detained. In *Roberts,* a police officer pulled into a one-lane driveway, blocking the car of a driver suspected of driving under the influence. Though the suspect was not attempting to leave, we held that, given the officer's actions and show of authority, a reasonable person would not have felt free to leave. *Roberts*, ¶ 16. Likewise, in *State v. Carlson*, we concluded that the occupants of a van were clearly not free to leave when, at gunpoint, the officers on the scene prevented them from leaving. 2000 MT 320, ¶ 20, 302 Mont. 508, ¶ 20, 15 P.3d 893, ¶ 20.

¶26 In contrast, a reasonable person would feel free to leave if an officer indicates, expressly or impliedly, that the stop is over and the person is free to go. In *Merrill*, both deputies had stepped away from the defendant's car after issuing a warning and telling the defendant she was free to go. *Merrill*, ¶¶ 3-4. Although the deputy asked permission to talk with the defendant and to search her car and person, nothing in the deputy's manner indicated he was ordering the defendant to stay and thus we concluded a reasonable person would have felt free to leave. *Merrill,* ¶ 15. Similarly, in *State v. Hill,* an officer stopped the defendant for speeding, issued a citation, returned his driver's license and said "we're done." 2004 MT 184, ¶ 5, 322 Mont. 165, ¶ 5, 94 P.3d 752, ¶ 5. Noticing the defendant had no bags or clothes in the car, the officer initiated small talk and obtained consent to search the car. *Hill,* ¶¶ 6-7. Relying on *Merrill,* we concluded

8

that a reasonable person would have believed he was free to leave and, therefore, the subsequent conversation was a voluntary exchange. *Hill*, ¶ 17.

¶27 In *Snell*, we determined, based on the implication of the officer's actions, that a reasonable person would have felt free to leave. Snell could not find his proof of insurance, and the officer instructed him to continue looking for it and bring the proof to his patrol car. *Snell*, ¶ 3. Snell entered the patrol car and told the officer he could not find current proof of insurance. The officer then returned Snell's license, issued a citation, and asked whether Snell would mind if he searched the vehicle. *Snell*, ¶¶ 3-4. We noted that the situation differed somewhat from *Merrill* and *Hill* in that Snell was sitting in the patrol car and the officer did not expressly state that Snell was free to go or that the matter was done. However, no evidence indicated that the officer ordered Snell to stay, attempted to restrain him, or prevented him from exiting the vehicle. In view of all the circumstances, we concluded a reasonable person would have felt free to leave the patrol car. *Snell*, ¶ 25.

¶28 Here, the patrol car was parked in such a way that it "physically constrain[ed] [Case's] means and direction of travel" in a similar manner to the patrol car in *Roberts*. *See Roberts*, ¶ 16. Both Officer Reid and Tucker were armed, in uniform, and the patrol car lights were flashing for the duration of the stop. Of course, this case differs from *Roberts* somewhat in that the legality of the traffic stop is not at issue. The question then becomes whether a reasonable person would have felt free to leave after his license and paperwork were returned to him and the traffic stop was technically complete.

9

¶29    Before receiving the traffic ticket, a reasonable person in Case's shoes would have assumed that the officers were investigating more than just a traffic violation. Case was initially ordered to get back in the car. After he had handed over his license, paperwork, address and phone number, Case was questioned as to whether he knew anything about Ronald Case and was asked to provide his social security number. Case was then ordered to step out of the car and asked if he had any weapons on him.

¶30    Next, and most importantly for the "free to leave" analysis, when Reid returned Case's paperwork he said, without pausing, "I do have a question for you before you take off here." When a police officer states that he has a question before you take off, that means, to the reasonable person, you have to stay and answer the question before you are free to leave, especially when the officer's patrol car is parked directly behind your car. Further, the series of questions leading up to Case's consent, the position of the two officers and Officer Tucker's investigation of Case's arm were objective signs that the investigation was ongoing and concerned more than mere traffic offenses.

¶31    Finally, just prior to asking Case if there was anything in his vehicle, Reid gave him a command, "go ahead and put your coat back on," indicating that Case remained under police control. As such, Case was effectively ordered to stay and was then prevented from leaving until he answered the officer's questions. In view of all the circumstances surrounding the incident, a reasonable person in Case's situation would not have felt free to leave.

¶32    Consequently, we conclude that Case was not involved in a voluntary exchange but was in fact "seized" when he gave Reid consent to search his car. We now turn to

10

whether the officers' detention of Case was lawful; that is, was there particularized suspicion to continue the investigation.

¶33    B. <u>Did the arresting officer possess sufficient particularized suspicion of wrongdoing to justify continuing the investigatory stop past the issuance of the traffic citation?</u>

¶34    The question of whether particularized suspicion of wrongdoing exists is a factually driven inquiry dependent upon the totality of circumstances. *Roberts*, ¶ 13 (citations omitted). Here, Reid clearly had particularized suspicion for the initial traffic stop, as Case was driving without headlights when it was dark and ran a red light. Still, "[a] stop authorized by 46-5-401 or 46-5-411 may not last longer than is necessary to effectuate the purpose of the stop." Section 46-5-403, MCA. If additional objective data of wrongdoing exists, however, the additional information may give rise to further suspicions and enlarge the scope of the investigation. *See State v. Nelson*, 2004 MT 310, ¶ 20, 323 Mont. 510, ¶ 20, 101 P.3d 261, ¶ 20.

¶35    In the case *sub judice,* there was sufficient evidence, presented at the suppression hearing and on the video, of objective data from which Officer Reid, an officer with sixteen years of law enforcement experience who has made "thousands" of stops during his career, could make certain inferences. Case, upon seeing the patrol car, reversed his car and turned to drive in the opposite direction. After Reid had signaled him to pull over, Case, rather than pulling over at obvious stopping points, continued driving to the rear of the Inn. Once stopped, Case attempted to leave his car, which, according to Reid, "is very common with people that use drugs or have something in the vehicle to hide."

He then leaned forward as if he was shoving something under his seat. When asked where they were coming from, White Wolf, who was known to the police, admitted they had come from April Romero's, a suspected meth house that Reid was actively investigating.

¶36    Subsequently, while writing the ticket and doing background checks, Reid learned that Case's car had been stopped the previous night, that syringes were found, and that the driver, Malard, was arrested. Further, this same Malard was involved in a previous crime with a *Ronald* Case who had skipped town. Although the confusion between Ronald and Raymond was lessoned after Tucker obtained Case's social security number, Tucker and Reid were still suspicious that there was a connection.

¶37    Therefore, while the purpose of the traffic stop had been effectuated, the additional information, including Case's questionable behavior, the multiple connections with drugs, and the Ronald/Raymond enigma, gave rise to further suspicions that served to properly enlarge the scope of the investigation.

¶38    C. <u>Was Case's consent to search, given during the legal additional investigation, voluntary and knowing?</u>

¶39    Voluntariness hinges on the totality of the circumstances. *Copelton,* ¶ 19 (citations omitted). Here, the only circumstance that Case claims affected the voluntariness of his consent was that the detention was illegal. As explained above, however, the State had particularized suspicion to continue the investigation past the completion of the traffic stop. We hold, therefore, that Case's consent was not the product of an illegal detention.

¶40 While the District Court concluded that Case was not detained at the time he consented to the search of his vehicle, and thus the court did not make a decision as to whether the State had particularized suspicion to continue the investigation, we will affirm a court's decision even if it reaches the right result for the wrong reason. *State v. Parrish*, 2005 MT 112, ¶ 20, 327 Mont. 88, ¶ 20, 111 P.3d 671, ¶ 20 (citations omitted).

## CONCLUSION

¶41 Case, while legally detained, voluntarily consented to the search of his vehicle. We therefore affirm the District Court's denial of Case's motion to suppress.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ JIM RICE

13