DA 10-0214

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 10

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

DONALD D. MURRAY,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Fifth Judicial District,
In and For the County of Jefferson, Cause No. DC 2009-11
Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Joslyn Hunt, Chief Appellate Defender; Matthew Wilcox, Assistant
Appellate Defender; Jacob Q. Johnson, Legal Student Intern, Helena,
Montana

       For Appellee:

              Steve Bullock, Montana Attorney General; Jonathan M. Krauss, Assistant
Attorney General, Helena, Montana

              Mathew Johnson, Jefferson County Attorney; Gregory C. Beebe, Deputy
County Attorney, Boulder, Montana

                         Submitted on Briefs:  December 1, 2010
                                Decided:  January 27, 2011

Filed:

            _____
                         Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1 Donald D. Murray (Murray) appeals from an order of the Fifth Judicial District Court, Jefferson County, denying his motion to suppress. Murray also appeals his sentence for operating a motor vehicle without liability insurance. We affirm in part, reverse in part, and remand for further proceedings consistent with this Opinion.

¶2 Murray presents the following issues on appeal:

¶3 Issue 1: Whether the District Court erred in denying Murray's motion to suppress?

¶4 Issue 2: Whether the District Court erred when it sentenced Murray for operating a motor vehicle without liability insurance?

¶5 Issue 3: Whether, in the alternative, the prosecutor erred in recommending a sentence for operating a motor vehicle without liability insurance that was outside the scope of the plea agreement?

## BACKGROUND

¶6 Shortly before midnight on July 24, 2008, Jefferson County Sheriff's Deputy Chad Cross was patrolling the town of Whitehall, Montana. While stopped at the intersection of Second Street and Division Street, Cross observed an older blue pickup pass in front of him, turn onto Yellowstone Trail, and immediately pull over, stop, and shut off its headlights. Cross proceeded with his patrol and eventually traveled back down Yellowstone Trail. Cross noted the truck was still parked alongside the road, and a man was walking two dogs on the side of the road, while another man remained in the passenger seat. Cross recognized Murray as the man walking the dogs. Cross passed the truck and continued his patrol.

2

¶7     Later, while Cross approached Yellowstone Trail from Kelly Road, he noticed the truck traveling on Yellowstone Trail. Cross pulled onto Yellowstone Trail behind the truck. While following the truck, Cross observed it weave across the center area of the unlined road and straddle the center area for approximately one to two seconds before weaving back to the right-hand side of the road. Cross believed that the truck's driver (Murray) had committed a traffic offense by failing to drive to the right side of the roadway, in violation of § 61-8-321, MCA. Cross continued to follow the truck to determine whether the behavior would repeat itself.

¶8     Shortly thereafter, however, the truck pulled into the Mormon Church parking lot and parked. Cross followed and parked, blocking the truck from reversing. While Cross radioed dispatch, Murray exited the truck with his dogs and walked away. Cross yelled at Murray to get his attention and requested that he return to the truck. Murray complied, and the subsequent interaction between Murray and Cross led to Murray's arrest for driving while under the influence of alcohol (DUI). On appeal, Murray does not challenge the legality of any events occurring after Cross contacted him.

¶9     Murray was charged in justice court with driving or operating a vehicle with a blood alcohol content of .08 or greater (DUI Per Se), in violation of § 61-8-406, MCA, and operating a motor vehicle without liability insurance, in violation of § 61-6-301, MCA. Murray filed a motion to suppress in justice court, arguing that Cross did not have sufficient particularized suspicion to stop him. The court denied his motion, and, following a bench trial, Murray was found guilty of both offenses. Murray then appealed to District Court and again filed his motion to suppress. The District Court denied the motion, concluding Cross

3

had particularized suspicion to stop Murray. Subsequently, Murray entered a conditional plea, whereby he agreed to plead guilty to both the DUI Per Se and no insurance charges on the condition that he could appeal the denial of his motion to suppress to this Court. Murray was sentenced for the no insurance offense to six months in the Jefferson County Jail, with all but two days suspended, credit for ten days of jail time served, and a $250 fine.

¶10 Murray appeals.

## STANDARD OF REVIEW

¶11 We review the denial of a motion to suppress evidence to determine whether the district court's findings of fact are clearly erroneous and whether the court correctly applied those findings as a matter of law. *State v. Rutherford*, 2009 MT 154, ¶ 9, 350 Mont. 403, 208 P.3d 389. Findings of fact are clearly erroneous if they are not supported by substantial credible evidence, the court has misapprehended the effect of the evidence, or if our review of the record leaves us with a definite and firm conviction that a mistake has been committed. *State v. Deines*, 2009 MT 179, ¶ 6, 351 Mont. 1, 208 P.3d 857. We review for clear error a finding that an officer had a particularized suspicion to conduct an investigative stop. *Rutherford*, ¶ 9.

¶12 This Court reviews criminal sentences for legality only, and we confine our review to whether the sentence falls within statutory parameters. *State v. Benoit*, 2002 MT 166, ¶ 18, 310 Mont. 449, 51 P.3d 495.

## DISCUSSION

¶13 Issue 1: *Whether the District Court erred in denying Murray's motion to suppress?*

4

¶14    "[A] peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense."  Section 46-5-401, MCA. Particularized suspicion exists where there is (1) objective data from which an experienced officer can make certain inferences and (2) a resulting suspicion that the occupant of a certain vehicle is or has been engaged in wrongdoing. *State v. Loney*, 2004 MT 204, ¶ 7, 322 Mont. 305, 95 P.3d 691.  A law enforcement officer's observation of a traffic offense more than satisfies the particularized suspicion requirement:  probable cause, rather than particularized suspicion, exists in that instance because there are sufficient facts and circumstances, rather than inferences and a resulting suspicion, within the officer's personal knowledge to warrant a reasonable person's belief that the suspect has committed an offense. *Loney*, ¶ 16; *In re License Suspension of Cybulski*, 2008 MT 128, ¶ 26, 343 Mont. 56, 183 P.3d 39.  Relevant to this appeal, § 61-8-321, MCA, provides that, subject to certain exceptions not applicable here, "[u]pon all roadways of sufficient width, a vehicle must be operated upon the right half of the roadway . . . ."

¶15    The District Court, after personally driving upon and viewing Yellowstone Trail, determined that the road was of sufficient width to allow vehicles to meet and remain upon their respective right halves of the road surface.  The District Court further noted that § 61-8-321, MCA, does not require that a centerline be marked with a paint stripe or otherwise, and Murray's failure to operate his truck to the right side of the roadway violated § 61-8-321, MCA.  Based on the above, the District Court denied Murray's motion to suppress, concluding that a violation of § 61-8-321, MCA, provides probable cause, a higher standard

than particularized suspicion, and, therefore, Cross was authorized to stop Murray. In the alternative, the District Court concluded that even if there was no statutory violation, Murray's unsteady travel from the left of center to the right of the roadway provided particularized suspicion for the stop.

¶16 On appeal, Murray argues that the District Court's determination that Yellowstone Trail is of sufficient width for § 61-8-321, MCA, to apply is unsupported by case law or statute and is unrealistic when applied to rural roads. In addition, Murray argues the District Court's alternative finding was error because Murray's weaving does not give rise to particularized suspicion.

¶17 We conclude the District Court's finding that Yellowstone Trail was of sufficient width and that Murray violated § 61-8-321, MCA, is not clearly erroneous. The District Court heard testimony from Cross who testified that he had no trouble staying on the right side of Yellowstone Trail. The District Court also noted that Murray acknowledged that almost everyone drives down the center of the roadway until another car approaches, at which time each vehicle drives on its respective right half of the road—an implicit admission that the road is sufficiently wide. Finally, the District Court independently viewed the portion of Yellowstone Trail at issue and concluded that "the road is of more than sufficient width to allow two vehicles to meet." After finding Murray drove on the left side of the road (Murray failed to refute this), the District Court correctly concluded Murray violated a statute, thus satisfying the particularized suspicion requirement for the stop. *See Loney*, ¶ 16. Because we affirm on the basis that Murray's violation of § 61-8-321, MCA, established probable cause for the stop, it is not necessary for us to address the District Court's

alternative holding that regardless of a statutory violation, particularized suspicion existed for the stop.

¶18 Issue 2: *Whether the District Court erred when it sentenced Murray for operating a motor vehicle without liability insurance?*

¶19 Section 61-6-301(4), MCA, provides that it is unlawful for a person to operate a motor vehicle upon ways of this state open to the public without a valid policy of liability insurance in effect. A first conviction of this offense is punishable by "a fine of not less than $250 or more than $500 or by imprisonment in the county jail for not more than 10 days, or both." Section 61-6-304(1), MCA.

¶20 Murray's sentence of six months with all but two days suspended clearly exceeds the statutory maximum penalty. The State concedes that Murray's sentence is illegal. Therefore, we remand to the District Court for resentencing to correct the illegal provision— the six month sentence—of Murray's sentence. *State v. Heafner*, 2010 MT 87, ¶ 11, 356 Mont. 128, 231 P.3d 1087. Because we reverse and remand for resentencing, we need not address Issue 3.

## CONCLUSION

¶21 We affirm the District Court's determination that Murray's violation of § 61-8-321, MCA, established probable cause, a higher standard than that of the minimum particularized suspicion requirement, thus justifying the investigatory stop. However, we reverse the sentence imposed by the District Court for failure to have liability insurance because it exceeds the statutory maximum sentence, and, therefore, we remand to the District Court to correct the illegal portion of the sentence.

¶22    Affirmed in part, reversed in part, and remanded for resentencing.

/S/ MICHAEL E WHEAT

We Concur:

/S/ PATRICIA COTTER
/S/ BRIAN MORRIS

Chief Justice Mike McGrath, specially concurring.

¶23    I concur with the result reached by the Court, but I write separately because I disagree that the dispositive issue was probable cause to arrest.

¶24    The majority, the District Court, and briefs filed on appeal, assume that Officer Cross required either particularized suspicion or probable cause because Murray's vehicle was stopped. However, this case does not concern a vehicular stop. Rather, the central issue is whether Murray was seized when Officer Cross engaged him in the parking lot of the Mormon Church. I would hold that Murray was never subjected to a constitutional seizure and suggest the Court take this opportunity to clarify its seizure jurisprudence.

¶25    When addressing the Fourth Amendment of the United States Constitution, the central inquiry is the reasonableness of the government's intrusion of an individual's personal security. *Terry v. Ohio*, 392 U.S. 1, 19, 88 S. Ct. 1868, 1878-79 (1968). An individual is seized for constitutional purposes when, by means of physical force or show of authority, his or her freedom of movement is restrained. *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S. Ct. 1870, 1877 (1980). In *Mendenhall*, Justice Stewart, writing for a plurality,

8

explained that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554, 100 S. Ct. at 1877. This Court adopted the *Mendenhall* test in *State v. Jenkins*, 192 Mont. 539, 543, 629 P.2d 761, 764 (1981), and has reaffirmed its use in later cases. E.g. *State v. Roberts*, 1999 MT 59, 293 Mont. 476, 977 P.2d 974; *State v. Wilkins*, 2009 MT 99, 350 Mont. 96, 205 P.3d 795.

¶26    Subsequent to *Mendenhall*, the United States Supreme Court revisited and altered its seizure jurisprudence on numerous occasions. *See I.N.S. v. Delgado*, 466 U.S. 210, 104 S. Ct. 1758 (1984); *California v. Hodari D.*, 499 U.S. 621, 111 S. Ct. 1547 (1991); *Florida v. Bostick*, 501 U.S. 429, 111 S. Ct. 2382 (1991). Although *Mendenhall* is still credited as the foundation for Fourth Amendment seizure inquiries, the federal test has evolved to inquire whether, in a totality of the circumstances, "the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Kaupp v. Texas*, 538 U.S. 626, 629, 123 S. Ct. 1843, 1845 (2003); *Brendlin v. California*, 551 U.S. 249, 254-55, 127 S. Ct. 2400, 2405-06 (2007) (citing *Bostick*, 501 U.S. at 435-36, 111 S. Ct. at 2386-87). This Court however, has remained tethered to the original *Mendenhall* language. *Wilkins*, ¶ 9. I believe that the "reasonable person" test has resulted in a confusing, unhelpful standard. This Court should take the opportunity to clarify it.

¶27    As a threshold matter, *Mendenhall*'s "reasonable person" standard has a problematic built-in contradiction, inquiring whether a reasonable person would feel free to leave, while

9

inherently recognizing that the reasonable person already feels a level of compulsion to remain. Some courts frame this as a citizen's interest in cooperating with law enforcement out of obligation, duty, or etiquette. *U.S. v Tavolacci*, 895 F.2d 1423, 1424 (D.C. Cir. 1990). Others acknowledge a level of pressure or coercion to stay when an officer approaches and begins questioning. *U.S. v. Simmons*, 918 F.2d 476, 480 (5th Cir. 1990) ("[O]ne's self-identification as a law enforcement officer is not so coercive that this statement alone renders an encounter between citizen and police a seizure."); *Colorado v. Melton*, 910 P.2d 672, 677 (Colo. 1996) (defendant felt no intimidation beyond "the inherent pressure felt by any citizen to cooperate with law enforcement officers"); *Tennessee v. Daniel*, 12 S.W.3d 420, 427 (Tenn. 2000) ("encounter did not become a seizure simply because Daniel may have felt inherent social pressure to cooperate"). Concurring in *Kolender v. Lawson*, Justice Brennan posited that the average person remains because he or she cannot know what is in an officer's head, and is not sure that walking away is actually an option. 461 U.S. 352, 368-69, 103 S. Ct. 1855, 1864 (1983) (Brennen J., concurring). Professor Wayne LaFave has reasoned that a literal interpretation of *Mendenhall* would convert nearly every interaction between citizens and the police into a constitutional seizure. Wayne LaFave, *Search and Seizure* vol. 4, § 9.4(a), 424 (4th ed., West 2004).

¶28    Furthermore, it does not make sense for this Court to continue to adhere to a standard that is impractical and unrealistic. Recently, the Tenth Circuit Court of Appeals expressed displeasure with *Mendenhall*'s focus, explaining "[i]t might bring greater clarity to this area of the law if the test were framed in terms of whether the officer's behavior is coercive rather than whether, under the circumstances, the reasonable person would feel 'free to disregard

10

the police,' which we suspect is unrealistic." *United States v. Thompson*, 546 F.3d 1223, 1226 n. 1 (10th Cir. 2008). The Supreme Court of Illinois has stated that "'a practical, realistic inquiry' . . . is not a description that one often sees applied to the *Mendenhall* standard." *Illinois v. Luedemann*, 857 N.E.2d 187, 202 (Ill. 2006). Such sentiments have been echoed by other courts and jurists. *Golphin v. State*, 945 So.2d 1174, 1190 (Fla. 2006) ("In interpreting the scope of the Fourth Amendment, courts appear to have steadily increased expectations that the 'reasonable person' is one who not only knows the full extent of his rights, but zealously protects them to the point that he will not hesitate to confront authority and demand the return of identification so that he may effect his right to walk away."); *United States v. Notorianni*, 729 F.2d 520, 522 (7th Cir. 1984) ("Maybe this is a wrong guess about what the average person feels in this situation but it is the law of this circuit."); *United States v. Williams*, 356 F.3d 1268, 1276 (10th Cir. 2004) (McKay J., dissenting) (arguing that the "reasonable person" is a legal fiction historically defined by the experience of judges, rather than the record at hand); *State v. Lalezari*, 1994 Ohio App. LEXIS 3800, 14-15 (Ohio App. 2nd Dist.) (doubting the legal fiction that a "reasonable person" is the most likely individual to resist authority and avoid coercion); *People v. Spicer*, 157 Cal. App. 3d 213, 218 (Cal. App. 2d Dist. 1984) (citing *State v. Shy*, 373 So.2d 145 (La. 1979) (acknowledging that the "reasonable person" standard "may be the greatest legal fiction of the late 20th century"); *Shy*, 373 So.2d at 148-49 (Dennis J., dissenting) (criticizing the "free to walk away" standard as both legalistic and unrealistic).

¶29 The foregoing leads me to conclude that Montana would be better served by abandoning *Mendenhall*'s "reasonable person" language. A clearer standard would be one

11

similar to the test recently adopted by the Oregon Supreme Court: Whether an officer's objective actions restrict, interfere with, or deprive an individual's liberty or freedom of movement. *See State v. Ashbaugh*, __ P.3d ___, 2010 Ore. LEXIS 899 (Ore. 2010). Such a standard properly turns on the officer's objective conduct.

¶30 Moreover, this Court has already chosen to break with federal seizure jurisprudence. *State v. Clayton*, 2002 MT 67, ¶ 22, 309 Mont. 215, 45 P.3d 30. In *Clayton*, this Court declined to follow the United States Supreme Court's holding in *Hodari D.*, 499 U.S. at 626, 111 S. Ct. at 1550, that an individual is not seized unless he or she actually yields to physical force or a show of authority. *Clayton*, ¶ 22. The Court determined that *Hodari D.* did not comport with the protections of the Montana Constitution. *Id.* at ¶¶ 21-22. As a result, in Montana a seizure can occur at the moment an officer displays authority, regardless of the individual's subjective response to the authority. *Id*. at ¶ 24. Considering this Court is no longer tethered to the federal seizure standard, I see no reason for continued adherence to the confusing and problematic "reasonable person" test.

¶31 Turning to the case at hand, Cross did not "stop" Murray's vehicle. He did not utilize the patrol car's light-bar or siren, or indicate that Murray was not free to continue driving. Rather, Cross merely followed Murray down the road. Moreover, Charles Massey, the passenger in the truck, testified that he and Murray were unaware that they were being followed by a police car, and insisted that they parked at the church for reasons unrelated to the car behind them. Thus, the proper focus of the inquiry is whether Cross seized Murray after the truck was already parked.

¶32 The objective circumstances do not support the conclusion that Murray was seized in the parking lot. Cross parked behind Murray's truck preventing him from reversing. In *Roberts* this Court held a seizure occurred after an officer blocked Roberts' car into a one-lane driveway, immediately exited the patrol vehicle, proceeded directly up to Roberts and engaged him in conversation. *Roberts*, ¶ 16. The circumstances here are quite different. Rather than exiting, Cross remained in his vehicle and radioed the dispatcher. Moreover, he sat and watched while Murray got out of the truck, removed his dogs and wandered off. Cross did not pursue Murray or demand engagement. Instead, he entirely ignored Murray, walked to the passenger side of the truck and spoke with Massey. Only after finishing with Massey and discovering that Murray was across the parking lot did Cross yell, in order to get Murray to approach. Accordingly, I would hold that no seizure occurred because Cross' actions did not objectively restrict, interfere with, or deprive Murray's liberty or freedom of movement.

/S/ MIKE McGRATH

Justice James C. Nelson joins in the foregoing specially concurring opinion of Chief Justice McGrath.

/S/ JAMES C. NELSON