FILED

August 26 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0153

DA 14-0153

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 254

STATE OF MONTANA,

      Plaintiff and Appellee,

   v.

TRISTA JO EMERSON,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Ninth Judicial District,
In and For the County of Toole, Cause No. DC-12-046
Honorable Robert Olson, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Wade Zolynski, Chief Appellate Defender, Jennifer Hurley, Assistant
Appellate Defender; Helena, Montana

      For Appellee:

            Timothy C. Fox, Montana Attorney General, Micheal S. Wellenstein,
Assistant Attorney General; Helena, Montana

            Merle Raph, Toole County Attorney; Shelby, Montana

Submitted on Briefs:  June 24, 2015
Decided:  August 26, 2015

Filed:

_____
Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1 Trista Emerson appeals from the judgment of the Ninth Judicial District Court, Toole County, finding her guilty of criminal possession of dangerous drugs and criminal possession of drug paraphernalia. We reverse.

¶2 The issue on appeal is whether the District Court should have granted Emerson's motion to suppress because Emerson's consent to a search of her purse was the fruit of an illegal seizure. Emerson raises a second issue regarding sentencing which we do not address because the first issue is dispositive.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3 Emerson was charged with, and pled guilty to, one count of criminal possession of dangerous drugs and one count of criminal possession of drug paraphernalia. Under the plea agreement, Emerson reserved her right to appeal the District Court's denial of her motion to suppress. At the suppression hearing, the State called one witness, Deputy Robins of the Toole County Sheriff's Office. Deputy Robins' testimony at the hearing and the parties' exhibits revealed the following facts.

¶4 On November 28, 2012, Deputy Robins stopped a vehicle near Shelby, Montana, because he recognized the driver, Joseph Bentley, and knew that Bentley had a felony warrant out for his arrest. Emerson was a passenger in the car when Deputy Robins stopped it. Bentley was arrested, and the car was released to Emerson after Deputy Robins spoke with the car's registered owner on Emerson's cell phone.

¶5 Approximately an hour later, Emerson entered the Toole County Sheriff's Office to request a gas card. The Sheriff's Office sometimes keeps gas cards on hand for people

2

who need assistance to travel somewhere, but did not have any at that time. After being told the Sheriff's Office did not have any gas cards, Emerson left the building.

¶6     A few minutes after Emerson left, the Sheriff's Office received a teletype from the Great Falls Police Department with an attempt to locate (ATL) on the car Emerson was driving. The ATL identified the vehicle and stated, "Attempt to locate vehicle loaned to Joseph Bentley on Friday [11/23/2012] to drive from Great Falls to Shelby and back. Owner has talked to him several times but he will not return the vehicle. If located please stop and contact this agency re CR12-40542." Deputy Robins could see from inside the Sheriff's Office that the car was still parked out front with Emerson inside. Deputy Robins went out and advised Emerson about the ATL and asked her to get out of the car, lock the car, give him the keys, and wait while he sorted out the ATL. According to Deputy Robins, before exiting the vehicle, Emerson "made a movement to close the top of [her] purse," but it remained partially open and Deputy Robins saw what he thought was an automatic pistol in the purse. Emerson left the purse on the center console in the vehicle.

¶7     Inside the Sheriff's Office, Deputy Robins asked Emerson to take a seat in the conference room while he called the Great Falls Police Department. According to Deputy Robins, he asked Emerson to wait because he wanted to find out if the Great Falls Police wanted Emerson arrested in connection with the ATL, even though the ATL did not say the car was stolen. Deputy Robins learned from the Great Falls Police that the owner wanted the car held until she could travel to Shelby to retrieve it.

3

¶8      While Deputy Robins was on the phone, Emerson went to the front desk and asked the dispatcher if she could retrieve her purse from the car. After Deputy Robins got off the phone, the dispatcher informed him that Emerson had requested her purse. Deputy Robins went to the car and retrieved the purse. Looking in the top of the open purse, Deputy Robins saw that what he initially believed may be an automatic pistol was in fact a makeup case. According to Deputy Robins, he did not search the purse; he merely looked into the open top.

¶9      Deputy Robins returned to the conference room and placed the purse between himself and Emerson on the table where Emerson was sitting across from him. Deputy Robins then turned on his digital voice recorder and stated, "We're in the process of ironing out an issue of a car [Emerson] was driving . . . . We're just returning her purse to her . . . ." The following conversation, in pertinent part, occurred:

> Robins: "I gotta ask . . . if there's anything in this purse that shouldn't be in here."
>
> Emerson: "No."
>
> Robins: "Anything illegal."
>
> Emerson: "No."
>
> Robins: "Anything at all."
>
> Emerson: "I don't believe so."
>
> Robins: "You don't believe so. Okay. Can I look?"
>
> Emerson: "No."

.   .   .

4

Robins: "If there's something in it that shouldn't be, you need to tell us."

. . .

Emerson: [crying] "I just wanna get home."

Robins: "The registered owner, okay, can give us permission to search the whole car. That would include your property inside the car. Out of the kindness of my heart, I brought your purse in here, okay, because I know this is your property, right? We're a hundred percent sure of that . . . . If there's anything in the purse that shouldn't be in there, you need to tell me. If there's not, you got nothing to worry about, okay. That's pretty clear, right?"

Emerson eventually admitted that Bentley had given her "something" to hold for him. Deputy Robins testified that, based on this conversation, he believed that the purse contained a gun.

¶10 Deputy Robins had Emerson read and sign a Miranda rights waiver and a consent to search form. Deputy Robins informed Emerson, "Right now you are not in custody. You need to understand that. You're not in custody." When he gave the consent forms to Emerson, he stated, "This is totally voluntary." Deputy Robins again asked Emerson what he would find during the search of her purse, and she admitted that there were needles in the purse that had been used for drugs. After Emerson signed the forms, Deputy Robins searched her purse and found a small amount of cocaine and needles.

¶11 The District Court denied Emerson's motion to suppress. Emerson appeals that decision.

**STANDARD OF REVIEW**

¶12 "We review a denial of a motion to suppress to determine whether the lower court's findings of fact were clearly erroneous and whether it correctly applied the law to

5

those findings." *State v. Strom*, 2014 MT 234, ¶ 8, 376 Mont. 277, 333 P.3d 218 (citation omitted).

## DISCUSSION

¶13    Emerson argues that she was illegally seized when she admitted she had contraband in her purse and consented to a search and, thus, that her admission and consent must be suppressed as the fruit of an illegal seizure.  In reviewing Emerson's allegation of an illegal seizure, we must first determine whether a seizure of Emerson has occurred.  Both the Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution protect citizens from unreasonable searches and seizures.  However, we have recognized that "not all personal intercourse between policemen and citizens involves 'seizures' of persons." *State v. Wilkins*, 2009 MT 99, ¶ 8, 350 Mont. 96, 205 P.3d 795 (quoting *Terry v. Ohio*, 392 U.S. 1, 19–20 n.16, 88 S. Ct. 1868, 1879 n.16 (1968)).  In determining whether a seizure has occurred, we apply the same test under both the federal and Montana constitutions. *State v. Case*, 2007 MT 161, ¶ 24, 338 Mont. 87, 162 P.3d 849.  "A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that [she] was not free to leave." *State v. Roberts*, 1999 MT 59, ¶ 16, 293 Mont. 476, 977 P.2d 974 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877 (1980)).

¶14    In *Mendenhall*, the Supreme Court provided examples of circumstances that may indicate a person was seized, including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or

6

the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554, 100 S. Ct. at 1877. We have repeatedly relied on these factors, often referred to as the *Mendenhall* factors, in seizure cases but we have also explained that the test is an objective one and "is necessarily imprecise and will vary depending on the setting in which the conduct occurs." *State v. Clayton*, 2002 MT 67, ¶¶ 21, 23, 309 Mont. 215, 45 P.3d 30 (citation omitted). The *Mendenhall* factors may be helpful in certain cases, but we have recognized that they are not exhaustive. *Wilkins*, ¶ 12.

¶15 If there has been a seizure, the State must prove it was reasonable by showing circumstances that create "a particularized suspicion that the person is or has been engaged in wrongdoing or was a witness to criminal activity." *Case*, ¶ 21 (citation omitted).

¶16 Our review of the circumstances convinces us that Emerson was seized. Deputy Robins asked Emerson to get out of the car, lock the car doors, give him the keys, and come inside the Sheriff's Office. It was midnight in November, Emerson had no transportation; her purse—which contained her phone and wallet—was locked inside the car, and the deputy had the keys to the car. Deputy Robins instructed Emerson to have a seat in the conference room while he called the Great Falls Police. When asked at the hearing if a person is expected to do something when a police officer tells her to, Deputy Robins responded, "Yes." When asked if Emerson was free to leave, Deputy Robins responded, "She was advised that she was not in custody." However, Deputy Robins did not tell Emerson that she was not in custody until after he had commenced a recorded

7

interrogation of her, during which she admitted to having drug paraphernalia in her purse, and he had obtained her verbal consent to search.

¶17 Both the State and the District Court treated the fact that Emerson left the conference room to ask the dispatcher for her purse as evidence that she was free to leave. However, the question is not whether Emerson felt free to leave a particular room, the question is whether a reasonable person would have felt free to leave the presence of the law enforcement officers entirely. If anything, her departure from the conference room to ask the dispatcher for her purse is evidence that she wished to leave but was unable to because only Deputy Robins had access to her purse.

¶18 Moreover, Deputy Robins stated at the hearing that he had particularized suspicion to detain Emerson because the ATL did not specify whether the car was stolen or not, so he needed to check with the Great Falls Police to determine if there was an arrest warrant associated with it. It should be apparent that no reasonable person would feel free to leave after an officer tells her to take a seat while he "clears up" a matter that might result in the person's arrest, and the officer has the keys to the locked car where the person's wallet and phone are stored.

¶19 Deputy Robins testified that the basis for the seizure was the ATL, specifically its instruction to stop the car and contact the Great Falls Police Department. It is well established that an officer can make an investigative stop in reliance on a report or bulletin from another law enforcement agency. *United States v. Hensley*, 469 U.S. 221, 232, 105 S. Ct. 675, 682 (1985); *State v. Hall*, 2004 MT 106, ¶ 11, 321 Mont. 78, 88 P.3d 1273. However, when a seizure is made on the basis of a flyer or bulletin, the

admissibility of any evidence uncovered as a result of the seizure turns on whether the officers who issued the bulletin possessed the requisite suspicion. *Hensley*, 469 U.S. at 231, 105 S. Ct. at 681-82; *Hall*, ¶ 11.

¶20 The State did not present any evidence at the suppression hearing showing that the Great Falls Police Department possessed any facts that would justify seizing Emerson. The only evidence presented indicated that the Great Falls Police Department told Deputy Robins over the phone that the owner wanted the vehicle held until she could retrieve it. Those facts justify seizing the vehicle, but they do not show a particularized suspicion that Emerson was engaged in wrongdoing or was witness to criminal activity. Thus, Emerson's initial seizure was illegal.

¶21 The State contends that, once Deputy Robins brought the purse inside and placed it on the conference room table, Emerson was free to pick up the purse and leave. On the other hand, the State argues that Deputy Robins had information that Bentley had his female companions carry a gun for him, and therefore Deputy Robins had to investigate the possibility that Emerson was bringing a gun into the Sheriff's Office to give to Bentley, who was locked in a cell in the same building. Thus, the State simultaneously argues that "Deputy Robins testified that Emerson could have picked up the purse and walked out of the building," and that, "[i]f there was anything dangerous or illegal in the purse, it was understandable that Deputy Robins was concerned about handing the purse back to Emerson in the Sheriff's Office building." Aside from contradicting each other, the record does not support either contention.

¶22 Once Deputy Robins spoke with the Great Falls Police Department and learned there was no allegation that the vehicle was stolen and there was no basis to arrest Emerson, he did not inform Emerson that the matter was finished or otherwise advise her that she was free to leave. Instead, he retrieved her purse, set it down on the table between them, turned on a tape recorder, and stated on the recording that he was questioning Emerson in connection with the ATL and the vehicle. No reasonable person would interpret an officer placing her purse on a table between them, turning on a tape recorder, and commencing an interrogation about the contents of her purse as a sign that she was now free to leave.

¶23 The State's second assertion, that Deputy Robins had to investigate whether the purse contained a gun intended for Bentley, is also not supported by the record. Deputy Robins testified that, at the point that he returned with Emerson's purse and began the recorded interrogation of her, he had already ascertained that what he initially believed was a gun in Emerson's purse was in fact a makeup case. Furthermore, as the State acknowledges, Emerson was in a public area. Bentley was locked in a cell in a secure area of the building. Emerson expressed no desire to see Bentley. Rather, she came to the Sheriff's Office to request a gas card.

¶24 We similarly cannot reconcile Deputy Robins' testimony that Emerson was free to pick up her purse and leave the conference room after he placed it on the conference table with his testimony that he had to question Emerson because of concerns that the purse might contain a gun. Moreover, Deputy Robins' professed concerns about a gun in Emerson's purse are belied by the fact that he never questioned her as to whether she had

a gun in her purse. Rather, he asked her if there was "anything illegal" in the purse, "anything at all." He made no mention to Emerson of any concern about her carrying a gun for Bentley.

¶25 At the time that Deputy Robins began his recorded interrogation of Emerson, the only facts known to him were that Emerson had done nothing illegal, was not in possession of anything illegal, was wanted for nothing, and had no access to Bentley. Because Emerson's seizure was not justified by objective facts showing a particularized suspicion of criminal wrongdoing, the seizure violated the prohibition on unreasonable seizures in the Fourth Amendment of the United States Constitution and Article II, Section 11 of the Montana Constitution.

¶26 Emerson's confession that there was contraband in her purse and consent to search were obtained as the result of an illegal seizure. They are thus fruits of the poisonous tree and are inadmissible. *See State v. Therriault*, 2000 MT 286, ¶ 57, 302 Mont. 189, 14 P.3d 444 ("The 'fruit of the poisonous tree' doctrine forbids the use of evidence which comes to light as a result of the exploitation of an initial illegal act of the police.").

**CONCLUSION**

¶27 The District Court erred when it determined that Emerson was not seized. The record demonstrates that Emerson was seized. No objective facts justified the seizure, hence, it was illegal and all evidence obtained as a result of it must be suppressed. We reverse and remand with instructions to suppress all evidence obtained as a result of the seizure.

11

/S/ JAMES JEREMIAH SHEA

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ JIM RICE