FILED

05/27/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0365

DA 23-0365

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 109

STATE OF MONTANA,

Plaintiff and Appellee,

v.

DONNA ELIZABETH SUMMERS,

Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DC-22-103
Honorable Howard F. Recht, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Pete Wood, Attorney at Law, Boise, Idaho

For Appellee:

Austin Knudsen, Montana Attorney General, Thad Tudor, Assistant
Attorney General, Helena, Montana

William E. Fulbright, Ravalli County Attorney, David Lakin, Deputy
County Attorney, Hamilton, Montana

Submitted on Briefs:  March 19, 2025

Decided:  May 27, 2025

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1      Donna Elizabeth Summers appeals the Twenty-First Judicial District Court's denial of her motion to suppress evidence obtained during a traffic stop. We restate the issues on appeal:

1. *Whether the investigating officer had particularized suspicion to transition a valid traffic stop into a drug investigation.*

2. *Whether the officer's continued questioning was constitutional because Summers consented.*

We conclude that the officer lacked particularized suspicion for a drug investigation but, under this Court's precedent and the totality of circumstances, did not violate Summers's constitutional rights when she agreed to answer his questions and consented to a search of her vehicle. We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

**Initial Investigatory Stop**

¶2      Ravalli County Detective Nick Monaco stopped Summers for speeding in May 2022. Summers had one passenger in the vehicle—Benjamin Ryan. Summers slowed her vehicle down about twenty-five seconds after Monaco activated his lights and pulled over about another twenty-five seconds later. Detective Monaco asked Summers why it took her so long to stop. Summers responded that she was not paying attention at first because she was singing and talking to Ryan, but then she was looking for a place to pull over. As Summers looked for her registration and insurance, Detective Monaco asked: "You seem really nervous[,] is everything okay?" Summers said yes and explained that she was doing

2

a lot of work at her house. Detective Monaco requested Ryan's identification. Ryan responded that he did not have it with him but provided his full name and birthdate.

¶3 Detective Monaco returned to his vehicle and called for information on Summers and Ryan. Dispatch informed him that Summers had a valid driver's license and no warrants but did have an alert for history of possession of dangerous drugs and possession of drug paraphernalia. Detective Monaco asked Summers to get out of the car, explaining that he could not hear anything. As Summers looked for an unexpired insurance card, Detective Monaco confirmed through dispatch that her insurance policy was valid.

**End of Traffic Stop and Further Questioning**

¶4 Detective Monaco returned Summers's driver's license, registration, and insurance card, said that he would "put [her] down for a warning," and reminded Summers of the speed limit. Summers responded that she had her cruise control on, and Detective Monaco and Summers engaged in a brief exchange about her speed and cruise control. Detective Monaco then stated: "Since I got you here, do you mind if I ask you a couple of questions?" Summers responded, "go ahead."

¶5 Detective Monaco continued to ask questions, in response to which Summers told him that she had known Ryan for just a couple of weeks and had hired him to install a water heater and that Summers had stopped using drugs a few years ago but had last used drugs about five months ago when her husband died. Detective Monaco asked if he could search the vehicle. Summers responded, "go ahead," and volunteered that she was on parole. Detective Monaco called probation and parole and obtained permission to search Summers's vehicle. He told Ryan that he was free to leave, but Ryan stayed. During the

3

vehicle search, Detective Monaco found a methamphetamine pipe and a small bag of methamphetamine.  Summers admitted that the pipe was hers.

¶6     The State charged Summers with felony possession of dangerous drugs and misdemeanor possession of drug paraphernalia.  Summers filed a motion to suppress, arguing that Detective Monaco unlawfully prolonged the traffic stop into a drug investigation without the requisite particularized suspicion.  The State responded that Detective Monaco had particularized suspicion to expand the stop into a drug investigation.  Detective Monaco testified at the hearing that Summers took longer than typical to pull over; he observed erratic movements through the back window (he acknowledged that the movements could be consistent with her later explanation that she was dancing); Summers was more nervous than the "innocent motoring public" and engaged in jittery movements, rapid speech, and nonstop chatter; she had a history of illegal drug use; and she was with an unfamiliar person.  The court also admitted Detective Monaco's dashcam video.

¶7     The District Court denied Summers's motion to suppress evidence.  Summers pleaded no contest to the charges but reserved the right to appeal the suppression ruling.

**STANDARD OF REVIEW**

¶8     When a district court denies a motion to suppress evidence, this Court reviews its findings of fact for clear error and determines as a matter of law whether the court applied the findings correctly.  *State v. Panasuk*, 2024 MT 113, ¶ 10, 416 Mont. 430, 549 P.3d 432.  "[F]indings of fact are clearly erroneous if not supported by substantial evidence, the court misapprehended the effect of the evidence, or upon our independent review of the record we are firmly convinced that the court was otherwise mistaken."  *Panasuk*, ¶ 10 (quoting

4

*State v. Noli*, 2023 MT 84, ¶ 24, 412 Mont. 170, 529 P.3d 813). "Whether a lower court correctly interpreted and applied the pertinent law to the facts at issue is a question of law subject to de novo review." *State v. Rymal*, 2024 MT 277, ¶ 9, 419 Mont. 144, 559 P.3d 839.

## DISCUSSION

¶9 The Fourth Amendment to the United States Constitution and Article II, Section 11, of the Montana Constitution prohibit unreasonable searches and seizures. Subject to certain exceptions, the search or seizure must be "conducted in accordance with a judicial warrant issued on probable cause." *Panasuk*, ¶ 12 (citing *Noli*, ¶ 26). Evidence obtained from an illegal search or seizure "must be suppressed." *State v. McElroy*, 2024 MT 133, ¶ 15, 417 Mont. 68, 551 P.3d 282.

¶10 A *Terry* stop is a recognized exception that allows police to briefly stop and detain someone (without a warrant or probable cause for an arrest) to "investigate a reasonable particularized suspicion that a person is immediately involved in, or about to be involved in, criminal activity." *Rymal*, ¶ 12.

¶11 "[O]n a valid traffic stop, the tolerable duration of police inquiry is limited to the time necessary to address the traffic violation and any related safety concerns[,] and authority for the seizure ends when tasks related to the traffic infraction reasonably should have been completed." *Panasuk*, ¶ 14; *see also* § 46-5-403, MCA. "Incidental police questioning of the driver or occupants to investigate other criminal activity of which there is no particularized suspicion cannot prolong the stop to any measurable degree beyond

5

what is reasonably necessary to quickly accomplish the justified purpose of the stop."

*Panasuk*, ¶ 14.

> "[F]urther questioning and the concomitant detention of a driver are permissible in only one of two circumstances: (1) during the course of the permissible scope of the traffic stop, the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity, or (2) the driver voluntarily consents to the officer's additional questioning.

*Panasuk*, ¶ 15 (citing *Noli*, ¶¶ 33-35; *State v. Laster*, 2021 MT 269, ¶ 40, 406 Mont. 60, 497 P.3d 224). If there is particularized suspicion, a Fourth Amendment seizure occurred but it is constitutional. *Panasuk*, ¶ 15. If the driver voluntarily consents, there is no seizure, and "the Fourth Amendment's strictures are not implicated." *Panasuk*, ¶ 15.

¶12 Because Detective Monaco stopped Summers for speeding, his inquiry was limited to the traffic-related infraction. The purpose of the traffic stop concluded when Detective Monaco issued her a warning and returned her driver's license, insurance, and registration. At this point, Summers had produced a valid driver's license and proof that she could operate the car, thus constitutionally requiring that she be allowed to proceed on her way without being subject to further delay by additional police questioning. *Panasuk*, ¶ 15; *accord Rodriguez v. United States*, 575 U.S. 348, 354, 135 S. Ct. 1609, 1614 (2015) ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."). To continue asking questions, Detective Monaco needed either particularized suspicion of illegal drug activity or voluntary consent. *Panasuk*, ¶ 15.

¶13 *1. Whether Detective Monaco had particularized suspicion to transition a valid traffic stop into a drug investigation.*

¶14 "Police must act with reasonable diligence to quickly confirm or dispel the particularized suspicion . . . that justified the initial stop, and any subsequent expansion in duration or scope must be based on new or additional particularized suspicion developed *within the lawful scope or duration of the initial stop* and before it should have reasonably been completed." *Panasuk*, ¶ 14. Once the officer has accomplished the justified purpose of the stop, "[p]articularized suspicion is required to expand a traffic stop into a drug investigation." *McElroy*, ¶ 14. Particularized suspicion is based on the totality of circumstances and requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Panasuk*, ¶¶ 12-13 (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968)). If "the only basis for suspecting a specific person of wrongdoing is inferences that could be drawn from the conduct of virtually any law-abiding person, the resulting suspicion cannot, by definition, be particularized." *State v. Carrywater*, 2022 MT 131, ¶ 15, 409 Mont. 194, 512 P.3d 1180.

¶15 The District Court found particularized suspicion for Detective Monaco to prolong the traffic stop based on Summers's nervous behavior, failure to immediately stop, travel with an unknown person, and history of drug usage. The District Court also found that Summers consented to answering Detective Monaco's questions. The court concluded that the totality of the circumstances showed that Detective Monaco both relied upon objective

7

observations to broaden the scope of his investigation and received consent from Summers—thus justifying the stop's expansion.

¶16 Summers concedes that Detective Monaco lawfully stopped her for speeding. She argues that Detective Monaco lacked particularized suspicion to expand the traffic stop and that the District Court improperly used facts discovered *after* he ended the traffic stop to conclude otherwise. Summers argues that the only facts the District Court could consider in determining whether Detective Monaco had particularized suspicion to expand the traffic stop into a drug investigation were her failure to immediately stop; her nerves as evidenced by being jittery and slurring her speech; and her unspecified drug use history. She maintains that the District Court clearly erred when it found that Summers was nervous and failed to immediately stop. Even taking these facts as true, Summers argues that they do not amount to particularized suspicion. The State does not advance a particularized suspicion argument on appeal.

¶17 In determining whether an officer had particularized suspicion to expand a traffic stop into a drug investigation, a court's inquiry is limited to the facts that the officer had at that moment in time. *Panasuk*, ¶ 15 ("Everything that comes *after* what is necessary to resolve the initial traffic violation comes too late to support continued detention of the offender."). The officer may not use information gained after they prolonged the stop to supplement the particularized suspicion. *Noli*, ¶ 62 ("if constitutional justification for the search or seizure was lacking, no evidence discovered as a result of a search of defendant can be used to justify the [antecedent seizure or search]") (citations and quotations omitted). We therefore consider what Detective Monaco knew upon ending the traffic stop

8

and issuing the warning: the Defendant's nervousness, her failure to pull over quickly, and her history of drug use.

¶18 We have discussed in several recent cases the behaviors of a motorist that are consistent with those of "virtually any law-abiding person" and therefore insufficient alone to prolong a stop. *Noli*, ¶ 32. For example, "without reasonable officer-articulated inferences of some *particular* criminal activity, . . . nervous or defensive behavior when monitored or confronted by police, or the desire to avoid or evade oncoming police are insufficient to support a reasonable *particularized* suspicion of *any particular* criminal activity." *Panasuk*, ¶ 17 (citation omitted). "Nervous behavior during a traffic stop is not uncommon and does not establish particularized suspicion to extend a traffic stop into a drug investigation[.]" *State v. Harning*, 2022 MT 61, ¶ 24, 408 Mont. 140, 507 P.3d 145. Similarly, "knowledge of a person's prior criminal involvement" alone does not give rise to particularized suspicion. *Panasuk*, ¶ 22. A law holding otherwise would unreasonably allow any person with any sort of record to be subject to a *Terry* stop without the need for separate justification. *Panasuk*, ¶ 22. The record here does not show that, when the traffic stop concluded, Detective Monaco had any specific details about Summers's prior drug possession history, including the dates, convictions, if any, or type of drugs or paraphernalia.

¶19 In *Carrywater*, we held that the driver trading seats with the passenger, a lower protruding jaw (which the officer alleged could indicate methamphetamine use), failure to stop immediately upon activation of the car's lights, and the defendant's nervousness did not give the officer sufficient particularized suspicion of illegal drug activity; rather, they

9

were "inferences based on inarticulable hunches attaching nefariousness to conduct entirely consistent with a law-abiding person." *Carrywater*, ¶¶ 5, 26. In *Wilson*, a messy vehicle, a nervous driver with an unlit cigarette, a borrowed vehicle, and unusual travel plans did not amount to particularized suspicion. *State v. Wilson*, 2018 MT 268, ¶ 34, 393 Mont. 238, 430 P.3d 77.

¶20 In other cases, we have noted additional factors that gave the officer particularized suspicion to expand the traffic stop into a drug investigation. For example, along with strewn clothing, luggage, and garbage, the heavy odor of vehicle deodorizer and corroborating information from an informant that the car carried a large amount of marijuana created a particularized suspicion. *State v. Roy*, 2013 MT 51, ¶ 17, 369 Mont. 173, 296 P.3d 1169. In *State v. Estes*, the officer had particularized suspicion of narcotics activity based on the two cell phones and cash in the console (despite the driver being alone); the driver's travel locations (Oregon and North Dakota, source destination areas for drug trafficking); the driver's nerves and shaking; food wrappers, garbage, energy drinks, and a sleeping bag; and an overwhelming odor from multiple air fresheners. *State v. Estes*, 2017 MT 226, ¶¶ 3, 18, 20, 388 Mont. 491, 403 P.3d 1249.

¶21 "[W]e have twice distinguished *Estes* as having at least two objective indicia of illegal drug activity" (a single driver with two cell phones and cash and an "uncommon number" of overwhelming air fresheners) "*in addition to* . . . otherwise innocuous and perfectly legal post-stop behavior" commonly asserted as "'indicators' of illegal drug trafficking activity (such as messy [or] 'hard travel,' extraordinary nervousness, eye contact avoidance, odd travel details, and other lawful behavior generally perceived as

10

suspicious, deceptive, or evasive)." *Noli*, ¶ 54 (citing *Carrywater*, ¶¶ 20, 26; *Wilson*, ¶¶ 29-31, 35); *see also Loberg*, ¶¶ 18, 24 (holding that particularized suspicion did not exist and reasoning that the odor of a masking agent alone was distinguishable from the overwhelming odor of multiple fresheners in *Estes*). In other words, although innocuous behavior may be assessed in the totality of the circumstances for particularized suspicion, there needs to be a least some objective indicia of illegal drug activity to justify expanding a traffic stop into a drug investigation. *Noli*, ¶ 62 ("[O]therwise perfectly legal or innocuous conduct or behavior may be a contributing factor in support of a particularized suspicion of criminal activity, but only in conjunction with other specific indicia of criminal activity.") (citation and internal quotations omitted).

¶22     These authorities lead to the conclusion that a driver's nervousness, an unspecified prior history of drug use, and the officer's assertion that the driver failed to pull over quickly enough do not alone combine to show particularized suspicion of illegal drug activity. With no specific indication of recent drug activity, the remaining observations are "inferences that could be drawn from the conduct of virtually any law-abiding person" and cannot by themselves create a particularized suspicion. *Carrywater*, ¶ 15. At the time Detective Monaco completed the speeding warning, the information he had obtained from and about Summers did not give him objective indicators that she was "immediately involved in, or about to be involved in, criminal activity." *Rymal*, ¶ 12. He failed to articulate "details that were objectively indicative of illegal drug activity" and instead acted on a generalized suspicion. *Wilson*, ¶¶ 28, 35; *accord Noli*, ¶ 62. The District Court erred

11

when it held that Detective Monaco had particularized suspicion to expand the traffic stop into a drug investigation.

¶23    *2. Whether Detective Monaco's continued questioning was constitutional because Summers consented.*

¶24    "Voluntary consent to a government search or seizure is an independent exception to the warrant requirement of the Fourth Amendment and Article II, Section 11, of the Montana Constitution." *State v. Laster*, 2021 MT 269, ¶ 40, 406 Mont. 60, 497 P.3d 224. "[T]he standard of consent applicable under the Fourth Amendment and Article II, [Section] 11, protections against unreasonable searches and seizures is merely that a consent to a government search or seizure be voluntary in fact under the totality of the circumstances, *i.e.*, 'the product of an essentially free and unconstrained choice' not influenced by express or implied police coercion or duress, however subtle." *Laster*, ¶ 40 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-34, 247, 93 S. Ct. 2041, 2047-49, 2058 (1973)).  This includes factors such as the person's age, education, and intelligence; misrepresentation of the law by the officer (indicating coerciveness); whether the person was in custody or under arrest; whether the person was informed of the right not to consent; whether they were threatened or coerced in any way; and whether the questioning was repeated and prolonged. *State v. Dupree*, 2015 MT 103, ¶ 19, 378 Mont. 499, 346 P.3d 1114.  "[T]he determination of voluntariness of consent is dependent on the facts of each case, with no single fact being dispositive." *State v. Case*, 2007 MT 161, ¶ 20, 338 Mont. 87, 162 P.3d 849 (citation omitted).

12

¶25 If a person is illegally detained when they consent to a search, the consent is tainted by the illegality and is "ineffective to justify the search." *Fla. v. Royer*, 460 U.S. 491, 507-08, 103 S. Ct. 1319, 1329; *see also Case*, ¶ 32 (reasoning that the defendant was "not involved in a voluntary exchange but was" seized when he consented). A person is seized for constitutional purposes when an officer "in some way restrains [the] person's liberty by means of physical force or otherwise by exercise or show of authority that, under the totality of the circumstances, would cause an objectively reasonable person to believe that the person is not free to leave the officer's presence." *Laster*, ¶ 11 (citations and internal quotations omitted). "In contrast a reasonable person would feel free to leave if an officer indicates, *expressly or impliedly*, that the stop is over and the person is free to go." *Case*, ¶ 26 (emphasis added).

¶26 In *State v. Merrill*, two officers stopped Merrill for an improper lane change. *State v. Merrill*, 2004 MT 169, ¶ 3, 322 Mont. 47, 93 P.3d 1227. Merrill consented to speak with the officers and to let them search her vehicle, where the officers found methamphetamine. *Merrill*, ¶ 4. This Court reasoned that although the investigatory stop had concluded, Merrill was not seized because the officer had stepped away from the vehicle after specifically telling her that she was free to go, and the subsequent interaction was a voluntary encounter. *Merrill*, ¶¶ 15, 17. We highlighted that the officer asked Merrill's permission three times: to talk to her, to search her car, and to search her person, and "Merrill's acquiescence to [the officer's] requests [was] not indicative of a person seized, but of a consenting individual." *Merrill*, ¶ 15.

13

¶27 In *State v. Hill*, following the officer's valid issuance of a traffic citation for speeding, he returned Hill's driver's license, said, "we're done," and then immediately "initiated small talk" and began to ask questions. *State v. Hill*, 2004 MT 184, ¶¶ 5-6, 322 Mont. 165, 94 P.3d 752. After that led to a search of the vehicle and Hill's charges for possession of dangerous drugs with intent to distribute, he challenged the officer's continuation of the stop. We affirmed the denial of Hill's motion to suppress, concluding in part:

> Once [the officer] gave back Hill's license and indicated the matter was done, the investigatory stop concluded. A reasonable person under these circumstances would have believed he was free to leave, and therefore, the subsequent conversation which developed between the officers and Hill was a voluntary exchange.

*Hill*, ¶ 17.

¶28 In *State v. Snell*, an officer lawfully stopped the defendant and cited him for failure to carry proof of insurance. *State v. Snell*, 2004 MT 269, ¶ 3, 323 Mont. 157, 99 P.3d 191. The officer issued the citation, returned Snell's license and registration and—while Snell remained seated in the back of the patrol car—asked if he could search the vehicle; Snell consented. *Snell*, ¶ 4. On appeal, Snell argued that he was illegally detained after the officer issued the citation, and the evidence should have been suppressed because the consent resulted from an illegal detention. *Snell*, ¶ 20. Although the officer did not expressly tell Snell that he was free to go (unlike in *Merrill* and *Hill*), nothing in the record indicated that the officer ordered Snell to stay, attempted to restrain him or prevented him from exiting the vehicle. *Snell*, ¶ 25. As such, the post-stop interaction was a voluntary exchange, and Snell was not illegally seized at the time he consented. *Snell*, ¶ 25.

14

¶29 In *State v. Case*, the officer issued Case a ticket and, as he returned his license and paperwork, stated, "I'm going to give you this back and I do have a question for you before you take off here." *Case*, ¶¶ 10-11. Case consented to the additional questions and vehicle search. *Case*, ¶¶ 11-13. We reasoned that "[w]hen a police officer states that he has a question before you take off, that means, to the reasonable person, you have to stay and answer the question before you are free to leave, especially when the officer's patrol car is parked directly behind your car." *Case*, ¶ 30. This statement, combined with the totality of circumstances—including that the officers first ordered Case to get back in his car, asked for his Social Security number and relation to another person named Case, and then directed him to step out of the car so they could verify whether Case had a tattoo on his arm, the position of the two officers, and their direction that Case could put his coat back on—led to our conclusion that Case was seized at the time he gave the consent. *Case*, ¶¶ 12, 29-32.

¶30 Summers argues that once Detective Monaco returned her driver's license and issued her a warning, he completed the purpose of the traffic stop. She contends that when Detective Monaco continued to question her after issuing her the warning, she was seized because Detective Monaco never informed her that the traffic stop was over or that she had permission to leave, and the totality of the circumstances would not lead a reasonable person to believe they were free to go. The State responds that Summers gave voluntary consent to answer more questions and to allow the search of her vehicle, as the District Court found.

¶31   The record shows the following pertinent exchange between Summers and

Detective Monaco after he had confirmed the validity of her insurance:

> MONACO: Here's everything that you gave me, okay, your license, registration, and insurance, okay.  So, I'm gonna put you down for a warning for the speed.
>
> SUMMERS: Okay.
>
> MONACO: Okay, just be mindful [it's] 60 top-end on Eastside Highway, okay? Um, do you have any—
>
> SUMMERS: Yeah, 'cause I had my cruise on, so, I was like sixty-five, or—
>
> MONACO: Okay, you were dip, you would go dip from 62 up to about 71, so—
>
> SUMMERS: Well, I was serious I had my cruise on so maybe there is something messed up with that.
>
> MONACO: Okay. So, um, since I got you here, do you mind if I ask you a couple of questions?
>
> SUMMERS: Go ahead.

During this interaction, Summers was standing on the side of the roadway between her car and the detective, whose patrol car was behind him.  Summers was not, unlike *Snell*, ¶ 4, *in* the patrol car, nor was Detective Monaco's patrol vehicle—as in *Case*—"parked in such a way that it 'physically constrain[ed] [the defendant's] means and direction of travel[.]'" *Case*, ¶ 28 (quoting *State v. Roberts*, 1999 MT 59, ¶ 16, 293 Mont. 476, 977 P.2d 974). Detective Monaco, however—unlike the officers in *Merrill* and *Hill*—did not expressly tell her that they were "done" or that she was free to leave.  But nor did he—like the officer in *Case*—direct her not to "take off" before he asked her another question.  *Case*, ¶ 11. Detective Monaco handed Summers her papers, told her she would get a warning, and

16

followed with a single incidental question. *Compare Laster*, ¶ 49 (a single, incidental request for consent to search did not substantially prolong the duration of the stop); *with Noli*, ¶ 48 (an officer's "extensive questioning . . . far exceeded in scope and duration the single incidental request for consent to search").

¶32    In *State v. Noli*, we concluded that the defendant's eventual, acquiescent consent was obtained only after a prolonged and an unlawful expansion of the scope and duration of the traffic stop without particularized suspicion. *Noli*, ¶¶ 23, 48; *see also State v. Clark*, 2008 MT 419, ¶ 25, 347 Mont. 354, 198 P.3d 809 ("Montana law does not require additional justification for requesting consent."); *Panasuk*, ¶ 15 (further questioning of driver once a traffic stop concludes is permissible if the driver voluntarily consents). Here, there was no prolonged expansion of the stop after it concluded; the detective asked Summers a single question—if she would "mind" answering some questions—and she agreed.

¶33    Summers contends that the District Court failed to employ a totality of the circumstances test, as required to determine voluntary consent. But this likely resulted from Summers's focus on particularized suspicion and her own acknowledgment that she had consented.[1] The court made a finding that Summers consented to Detective Monaco's

---

[1] Relatedly, we do not accept Summers's argument that the State waived any argument on appeal that she was not "seized" when Detective Monaco transitioned the stop into a drug investigation or that she voluntarily consented to his expansion of the traffic stop. The State never conceded that Summers did not consent but argued in the District Court that Summers agreed to answer Detective Monaco's additional questions and gave Detective Monaco permission to search her vehicle. Summers in fact stated in her own motion to suppress that she agreed to the additional questioning and consented to the vehicle search. During the suppression hearing, defense counsel argued that if her consent to search the vehicle had been obtained prior to issuing the citation it would be valid, but once the citation was issued, any information obtained was invalid.

request for additional questions and to his request to search her vehicle. "Because voluntariness of consent is a question of fact, the trial court's finding that consent was voluntary will not be reversed unless the finding is clearly erroneous." *City of Great Falls v. Allderdice*, 2017 MT 58, ¶ 12, 387 Mont. 47, 390 P.3d 954.

¶34 Summers urges us to hold that Detective Monaco's single phrase, "while I've got you here," turned his permissive question ("do you mind if I ask you a couple of questions?") into a directive that would lead a reasonable person to conclude they were not free to leave. But the voluntariness of her consent is not determined alone by the parsing of Detective Monaco's question; it "is dependent on the facts of each case, with no single fact being dispositive." *Case*, ¶ 20. Upon review of the circumstances of the entire interaction, and in light of our precedent, we conclude that Summers has not demonstrated clear error in the District Court's finding that she gave voluntary consent to continue speaking with Detective Monaco. From the beginning of the stop, Summers engaged in nearly constant conversation with the detective, even interrupting him. He asked no questions unrelated to the purpose of the stop until after he returned her papers and told her she would get a warning for speeding.

¶35 We have not required that an officer explicitly tell a person that the stop has concluded and they are free to leave before asking whether they would agree to answer questions. *Snell*, ¶ 25 (totality of circumstances showed that individual was not seized and voluntarily consented despite officer not advising him that the stop had ended); *Laster*, ¶ 40 ("proof of a rights advisory by police is not necessarily essential or fatal to whether a

18

consent to search or seize was voluntary in fact"). If the driver voluntarily consents, there is no seizure, and "the Fourth Amendment's strictures are not implicated." *Panasuk*, ¶ 15.[2]

¶36 The investigative technique employed under the circumstances here, however, points to a crucial difference between a purely voluntary encounter between citizens and law enforcement officers and questioning that follows a person's temporary detention after a *Terry* stop. We recently discussed at length the circumstances under which an "initially coincidental or consensual police-citizen encounter may later ripen into a constitutional seizure . . . when the subject police conduct and posture would have caused an objectively 'reasonable person' to feel not free to ignore or refuse to answer or otherwise cooperate with the police[] or disengage from any further interaction with them and move away." *Rymal*, ¶ 15. Summers's encounter with Detective Monaco was not, like in *Rymal*, "initially coincidental or consensual." *Rymal*, ¶ 15.

¶37 Traffic stops that lead to further questioning or searches based on consent present a different situation, as they are unlike interactions in which a person free of any prior seizure is initially approached by police. *E.g., Rymal*, ¶ 16 (illustrating cases where we held that a constitutional seizure had not occurred). Instead, a person subject to a traffic stop has just been immediately seized based on a traffic infraction or on particularized suspicion of

---

[2] Summers cites *State v. Bailey*, 2021 MT 157, ¶ 30, 404 Mont. 384, 489 P.3d 889, for its statement that "[b]ecause a person is typically not free to leave until released by the investigating officer, a temporary investigative stop generally effects a Fourth Amendment seizure" (quoting *City of Missoula v. Kroschel*, 2018 MT 142, ¶ 25, 391 Mont. 457, 419 P.3d 1208). *Bailey* and *Kroschel*, however, involved the issue whether an officer's questioning during an investigative stop amounted to custodial interrogation requiring *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 467-77, 86 S. Ct. 1602, 1624-29 (1966); *Bailey*, ¶ 27; *Kroschel*, ¶ 21. Neither case involved the question of consent to an officer's request to answer questions.

other criminal activity. A person is under police authority during a traffic stop, and it may not be clear to the person when the stop has ended. Cases where the traffic stop transitions into a drug investigation based on consent pose the risk that the prior seizure clouds a person's understanding of when they are no longer subject to the officer's authority.

¶38 "Consent searches are no longer an occasional event . . . but are now a wholesale activity accompanying a great many traffic stops, submitted to by most drivers, guilty or innocent, and resulting in continued interruption of their travels . . . a process which beyond question is highly invasive of the dignitary interests of individuals." 4 Wayne R. LaFave, *Search and Seizure* § 9.3(e), 547-48 (6th ed. 2020) (discussing how obtaining consent to search has become a routine investigative technique during traffic stops) (internal quotations and citation omitted). An officer's clear communication with members of the public with whom the officer interacts, at minimum, is good police practice. Better yet, such clear communication—by explicitly telling a motorist that the stop has concluded and they are free to go *before* requesting consent to additional questioning or a search—will help avoid claims of "implied police coercion or duress, however subtle," *Laster*, ¶ 40, like the challenge that Summers raises here. *E.g. Hill*, ¶ 5 (officer issued warning and stated "we're done" before initiating subsequent conversation); *Merrill*, ¶ 15 (officer advised the person that they were free to leave); *see also Laster*, ¶ 40 (the person's awareness of their right to refuse is a factor in assessing voluntariness of consent); *Estes*, ¶ 21 ("A reasonable person would feel free to leave when an officer expressly indicates that the stop is over and the person is free to go.").

20

¶39    Considering the record as a whole, we cannot conclude that the District Court's factual finding that Summers authorized the additional questioning by giving her consent, thus validly expanding the stop, was clearly erroneous. The record reflects that after Detective Monaco issued the warning and returned Summers's papers, she agreed to the detective's single request for further questioning. Detective Monaco asked Summers's permission to search her vehicle, and she again consented.[3] We conclude that the District Court did not misapprehend the effect of the evidence when it determined that Summers consented to the additional questioning and the subsequent vehicle search.

**CONCLUSION**

¶40    The District Court's order denying Summers's motion to suppress is affirmed.

/S/ BETH BAKER

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE

---

[3] Finally, we do not agree with Summers that Detective Monaco exceeded the scope of her consent to answer additional questions. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Fla. v. Jimeno*, 500 U.S. 248, 251, 111 S. Ct. 1801, 1803–04 (1991). The video shows that their exchange was just over three minutes before Detective Monaco requested permission to search Summers's car, which is not outside an objectively reasonable understanding. At no point did Summers "withdraw [her] apparent consent." *Rymal*, ¶ 19. Summers does not otherwise independently challenge the voluntariness of her consent to search the vehicle but contends that it followed from the same impermissible questioning after Detective Monaco issued the warning for speeding.

21

Justice James Jeremiah Shea, concurring.

¶41 I concur with the Court's resolution of both issues. With respect to issue two, I concur because, as the Court ultimately concluded, "considering the record as a whole, we cannot conclude that the District Court's factual finding that Summers authorized the additional questioning by giving her consent, thus validly expanding the stop, was clearly erroneous." Opinion, ¶ 39. I write separately because I think this case illustrates better than most that when the circumstances of a consent search such are tenuous and subject to interpretation, things easily can go the other way. In that regard, it should not go unnoticed in this case that three of this Court's seven Justices—all of whom were experienced district court judges from across the State prior to their service on this Court—considered this same record in its entirety, concluded that Summers's consent was *not* voluntary, and would reverse the District Court's order denying Summers's motion to suppress. My takeaway from that is that I have little doubt that a number of current district court judges would view this same record and reach the same conclusion as Justices Bidegaray, McKinnon, and Gustafson—that Summers's motion to suppress should be granted.

¶42 If I had been the trial judge, I may very well have reached a different finding as to whether Summers consented to continued questioning. But whether or not my personal assessment of the record may differ from the District Court's assessment is not the issue on appeal. "It is not this Court's function on appeal to substitute its evaluation of the evidence for that of the district court." *State v. Fish*, 2009 MT 47, ¶ 29, 349 Mont. 286, 204 P.3d 681. "[V]oluntariness of consent is a question of fact, [and] the trial court's finding that consent was voluntary will not be reversed unless the finding is clearly

22

erroneous." *Allderdice*, ¶ 12. Based on our standard of review on appeal, if the District Court reviewed this record and found Summers's consent was *not* voluntary, I would be hard-pressed to conclude such a finding to be clearly erroneous. However, the District Court reviewed this record, conducted a hearing at which it took testimony, and found that Summers's consent *was* voluntary, and I agree with the Court that this finding was not clearly erroneous. On that basis—and only on that basis—I would affirm the District Court's denial of Summers's motion to suppress.

/S/ JAMES JEREMIAH SHEA

Justice Katherine Bidegaray, dissenting.

¶43 I respectfully dissent from the majority's conclusion regarding Issue 2. While I concur with the majority's thorough analysis that Detective Monaco lacked particularized suspicion to extend the traffic stop into a drug investigation, I disagree with the majority's determination that Summers voluntarily consented to further questioning and the vehicle search.

¶44 A citizen's consent must be unequivocally voluntary, free from any coercion—express or implied. *State v. Laster*, 2021 MT 269, ¶ 40, 406 Mont. 60, 497 P.3d 224 ("Upon challenge of the voluntariness of a consent to search, the State has the burden of making an evidentiary showing, by more than mere acquiescence to police authority, that the consent was voluntary as a matter of fact under the totality of the circumstances."). The voluntariness of consent is evaluated under the totality of circumstances, with special attention paid to subtle coercion that can arise in inherently authoritative encounters such

23

as traffic stops. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–27, 93 S. Ct. 2041, 2047 (1973) (the test of voluntariness is that consent be the product of "an essentially free and unconstrained choice"); *State v. Emerson*, 2015 MT 254, ¶¶ 16-22, 380 Mont. 487, 355 P.3d 763.

¶45 Here, after concluding the purpose of the stop by issuing a warning, Detective Monaco immediately transitioned into further questioning with the phrase: "Since I got you here, do you mind if I ask you a couple questions?" This phrase, coupled with the officer's immediate continuation of questioning, conveyed ongoing investigative authority rather than the conclusion of the stop, suggesting Summers was not truly free to leave. Unlike scenarios in *State v. Merrill*, 2004 MT 169, ¶¶ 15, 17, 322 Mont. 47, 93 P.3d 1227, and *State v. Hill*, 2004 MT 184, ¶ 17, 322 Mont. 165, 94 P.3d 752, Detective Monaco did not explicitly inform Summers that she was free to leave or clearly delineate that the traffic stop had concluded. Furthermore, Detective Monaco's authoritative positioning and the roadside environment significantly contributed to the coercive atmosphere, factors which the majority opinion insufficiently addresses.

¶46 Summers's acquiescence to Detective Monaco's questioning—"go ahead"—must be viewed within this inherently coercive context. Summers, who had not been explicitly released from the seizure and was not affirmatively informed of her right to refuse further questioning, responded precisely as a reasonable person under similar circumstances might, believing compliance was obligatory rather than optional.

¶47 The majority's reliance on Summers's brief and ambiguous statement ignores the subtle coercion present in the situation. Summers was on the roadside, previously detained

24

in Monaco's opinion, but not given a clear indication the stop was complete. Moreover, Summers's general talkativeness does not override the subtle coercion Detective Monaco created by his ambiguous language and posture, as conversational engagement alone is insufficient to demonstrate genuine voluntariness under these specific circumstances. Under these conditions, her consent was neither unequivocal nor voluntary.

¶48 Given these considerations, the record clearly demonstrates that Summers's consent was not the product of "an essentially free and unconstrained choice" and therefore not voluntary. Accordingly, I would hold Summers's purported consent was not voluntary under the totality of circumstances and reverse the denial of her motion to suppress.

¶49 For these reasons, I dissent.

/S/ KATHERINE M BIDEGARAY

Justices Laurie McKinnon and Ingrid Gustafson join in the dissenting Opinion of Justice Katherine Bidegaray.

/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON